

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00394-CR

JAMES LAWRENCE SMITH                                    APPELLANT

V.

THE STATE OF TEXAS                                           STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

----------

## OPINION

----------

## I. Introduction

Appellant James Lawrence Smith appeals his conviction for assault family violence. He contends in five issues that the evidence is insufficient to support his conviction because he acted out of self-defense, that the trial court erred by excluding evidence of the complaining witness's alleged bias or motive, that the trial court erred by refusing to instruct the jury on the defense of confinement, and that the trial court erred by failing to afford him the right of allocution. We affirm.

## II. Background

Tammy Moss, the complainant, testified that on Sunday, November 2, 2008, she attended church with her then-husband Appellant and her children, C.M. and Z.M.[1] Moss testified that she drove home with her children after church and that Appellant was waiting for them in the backyard because he did not have a key to the house.[2] Moss testified that she went into the backyard and attempted to talk with Appellant. Appellant entered the house angrily, forcibly opening the back door and stepping on their puppy.

Moss testified that she followed Appellant into the house and questioned him about his actions. She said that Appellant started cursing and that Appellant and Z.M. then began arguing about Appellant's profane language. Moss testified that she retrieved a suitcase from the attic, took it downstairs, and put it on the bed in the master bedroom. She testified that as she was taking Appellant's clothes from the closet to put them into the suitcase, Appellant entered the bedroom, walked toward her, pushed her into the closet, and began cursing and calling her names. Moss said that Appellant made a derogatory comment about their lack of sexual intimacy and that he "picked [her] up and threw [her] around in the closet" by grabbing her forearms. Moss testified that Appellant also called

---

[1]At the time of the August 2009 trial, Z.M. was sixteen years old, and C.M. was fifteen years old. Appellant is not their father.

[2]Moss testified that she had taken Appellant's house key and asked him to move out approximately three weeks earlier.

her another derogatory name and threw her against the towel rack in the master bathroom.

Moss testified that she was scared, began hyperventilating, and could not breathe; that Appellant was shaking her; that she yelled to Z.M. for help; and that Appellant dropped her onto the carpet when he saw Z.M. Moss testified that Z.M. had a knife in his hand and that Appellant choked Z.M. with one hand on his neck and the other hand near the knife. Moss said that she yelled at Z.M. and Appellant to stop, that Appellant let go of Z.M., and that she left the room to call 9-1-1.[3]

Moss testified that the police arrived; spoke with her, Z.M., and C.M.; and took photographs of her injuries. She also testified to feeling pain from being pushed, grabbed, and shaken, and she described the bruises depicted in some of the photographs admitted into evidence. Moss also said that she applied for and was granted a protective order against Appellant soon after the incident.

On cross-examination, Moss denied making plans to divorce Appellant or having consulted a divorce attorney before the incident, and she testified that although she was scared of Appellant after the incident, she was not scared of him at the time of trial. Moss also denied having had dinner or meeting with Appellant forty times after the protective order was entered, but she later

---

[3]The recording of the 9-1-1 call was admitted into evidence and played for the jury.

3

admitted to meeting Appellant to—according to her—discuss issues relating to their divorce.

Z.M. testified that he rode with Appellant to and from church the morning of the incident. He said that he and Appellant arrived home first, that they waited in the garage for approximately ten minutes because Appellant did not have a key, that Appellant was agitated about not having his key, and that Appellant and Moss began arguing when Moss arrived. Z.M. said that he and his sister went into the kitchen and that Appellant and Moss continued arguing outside.

Z.M. also testified that Appellant soon entered the house as if he were "storming off" from Moss, that Appellant opened the door forcefully, that Appellant and Moss continued arguing in the house, and that Moss's voice was louder than it had been earlier. Z.M. testified that Moss first went upstairs for a suitcase and then to the master bedroom and that Appellant went into the garage but then walked into the master bedroom. Z.M. testified that he heard "a loud boom and yelling" coming from the master bedroom and that the loud boom sounded like "a slam against the wall." Z.M. also testified that Moss yelled his name, that he believed Appellant was hurting her, and that he grabbed a knife from the kitchen because he had never heard his mother scream like that before.

Z.M. testified that he went into the master bedroom, knife in hand, and saw Appellant kneeling down over Moss in the closet area, choking Moss with his right hand; it looked to Z.M. as if Moss could not breathe. Z.M. testified that he yelled at Appellant to get out of the house and raised the knife upward as

4

Appellant moved closer to him in anger and Moss left the room. Z.M. testified that Appellant pushed him in the chest with both hands, put one hand on his throat, and used the other hand to hold the arm with the knife against the wall. Appellant released him when Moss returned to the room. On cross-examination, Z.M. acknowledged that he does not know what occurred in the bedroom before he got there, and he testified that he had seen Moss and Appellant argue before and that he was not alarmed until Moss called out for him.[4]

Sergeant Jorge Sanchez[5] of the Frisco Police Department testified that he received a dispatch for a domestic disturbance involving a physical altercation between a male and female and that he and two other officers arrived at the home to find Appellant in the garage trying to get the officers' attention. Sergeant Sanchez testified that he entered the residence to interview Moss and that she had redness on her neck and was visually upset, crying, distraught, and shaking. Sergeant Sanchez testified that he interviewed each person in the home and that Appellant requested that Z.M. be arrested for approaching him with a knife. Sergeant Sanchez did not arrest Z.M. because he said it was clear to him that Z.M. was responding to Appellant's assault on Moss; instead, Sergeant Sanchez arrested Appellant based on the information gathered during his investigation.

---

[4]C.M. also testified about the events leading up to and including the physical altercation between Moss and Appellant and between Z.M. and Appellant. C.M.'s testimony is largely cumulative of and consistent with that by Moss and Z.M.

[5]Sergeant Sanchez was a corporal at the time of the incident.

Officer Jeremy Shirley testified to Appellant's statements at the scene that Moss had struck him first in the buttocks. Officer Michael Choate testified that he remained in the garage with Appellant and that Appellant called Moss a derogatory name several times.

Appellant testified that Z.M. rode home with him from church and that he waited first in the garage and later in the backyard for Moss to arrive. Appellant said that Moss approached him in the backyard wanting to talk and that he went inside because he did not want to talk with her. Appellant said he accidentally stepped on the puppy when entering the house, and he denied kicking or intentionally stepping on it. Appellant testified that Moss became angry and started yelling and "verbally berating" him, accusing him of kicking the puppy. Appellant also testified that Moss "slapped [him] in the rear end" as he was walking into the house.

Appellant testified that Moss yelled at him to get out of the house and that he went to the garage for two to three minutes to cool down and de-escalate the situation. He then went into the master bedroom, where he saw a suitcase on the bed with clothes on top of it. When Appellant picked up some of the clothes and started taking them back to the closet, he saw that Moss was between him and the closet. He testified that Moss pushed him hard to prevent him from putting the clothes away, and he stated, "I grabbed her and pushed her over against the clothes on the side." Appellant said that he grabbed and pushed Moss because she had pushed him in her attempt to keep him from putting the

6

clothes away. He said that he put the clothes in the closet, that Moss pushed him again, and that he "grabbed her by her arms." Appellant said that Moss was fighting back and pushing but that he stopped holding her when she asked him to stop. Appellant denied hitting Moss or pulling or grabbing her hair, and he testified that he had already released Moss before Z.M. entered the room.[6]

Appellant testified that after his struggle with Z.M., he released Z.M., left the room, and went to the garage to diffuse the situation and wait for the police.

Appellant testified that Moss has a temper, gets angry, and can become physical. He described three prior incidents where Moss was physically aggressive, testifying that Moss had punched Z.M. in the neck in late 2006 because Z.M. had not vacuumed properly, that Moss had struck Z.M. in November 2007 as they argued, and that Moss became physically aggressive with his daughter M.S. in November 2007. Appellant testified that Moss kicked him in the stomach during the incident involving M.S. and that Moss's children are afraid of her because of her violence. Finally, Appellant testified that he had been to dinner with Moss forty times since the incident and entry of the protective order, that they spent the night together on New Year's Eve in 2008, and that Moss's reputation in the community for truth and veracity is not good.

---

[6]Appellant admitted on cross-examination, however, that he was angry when he went to the garage to cool down, that seeing the clothes and the suitcase in the bedroom made him angry, and that he was still angry when he went into the closet with his clothes. Appellant also admitted to making derogatory remarks about Moss to the police and telling the police that he had pushed Moss.

Michelle Reavis testified that she had once been close friends with Moss and that she had lived with Moss for five days. Reavis testified that Moss's reputation in the community for truth and veracity is not good and that Moss is "Dr. Jekyll and Mr. Hyde." Mark Moss, Moss's ex-husband and Z.M. and C.M.'s father, testified that he was married to Moss for seventeen years and that her reputation in the community is for being untruthful. Moreover, Wilberto Cordero, John McKennie, and Laura Smith each testified that Moss's reputation in the community for truth and veracity is not good.

The State charged Appellant by information with "intentionally or knowingly or recklessly caus[ing] bodily injury to Tammy Moss" by "grabbing or pushing or throwing" her with his hand, and the jury found Appellant guilty of assault as alleged in the information.[7] The trial court sentenced Appellant to 270 days' confinement, probated for eighteen months. This appeal followed.

### III. Sufficiency of the Evidence

Appellant contends in his first and second issues that the evidence is legally and factually insufficient to support his conviction for assault because "no rational factfinder could have found against [him] on his claim of self-defense."

---

[7]The State also charged Appellant by information with assaulting Z.M., but the jury found Appellant not guilty in that case.

8

## A. Standard of Review

The court of criminal appeals has held that there is no meaningful distinction between the legal and factual sufficiency standards. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)). Thus, the *Jackson* standard, which is explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* Therefore, we combine Appellant's first and second issues and apply the *Jackson* standard to determine whether the evidence is sufficient to sustain Appellant's conviction. *See id.*

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d

9

564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the State bears the burden of persuasion to disprove it. *Id.*; *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd). This burden does not require the State to produce evidence disproving the defense; it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913; *Dotson*, 146 S.W.3d at 291. To determine the legal sufficiency of the evidence to disprove self-defense, the appellate court asks whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

10

the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291.

## B. Applicable Law

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." Tex. Penal Code Ann. § 22.01(a)(1) (West 2011). However, penal code section 9.31(a)(1) provides in relevant part that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2011).

## C. Discussion

The evidence is legally sufficient to support Appellant's assault conviction and the jury's rejection of self-defense. Viewing the evidence in the light most favorable to the verdict and resolving any conflicting inferences in favor of the prosecution, the evidence reflects that Appellant was angry when Moss arrived home from church; that he forcibly opened the back door, entered the house, and argued with Moss; that, while still angry, he went into the bedroom where he saw the suitcase and clothes and became angrier; that Moss was between him and the closet when he sought to put his clothes away; and that by Appellant's own testimony, he "grabbed [Moss] and pushed her over against the clothes on the side." Although Appellant testified that Moss hit him from behind as he walked

11

into the house from the backyard and later pushed him at least twice in the bedroom as he attempted to put his clothes back into the closet, it was for the jury to determine whether Moss's or Appellant's testimony was more credible, and we are not permitted to re-evaluate the weight and credibility of the evidence. *See Williams*, 235 S.W.3d at 750.

Appellant contends that the evidence is insufficient to support his conviction because he only grabbed Moss to stop her from pushing and fighting with him and that he released her when she stopped fighting with him. Appellant further argues that "no compelling evidence" supports Moss's account of the incident because (1) Z.M. and C.M. did not witness the struggle between him and Moss; (2) Z.M. and C.M.'s testimony is not credible because they are afraid of Moss; (3) Appellant did not flee but instead waited for the police to arrive; (4) several witnesses testified that Moss has an unfavorable reputation in the community for truth and veracity; (5) Moss contacted or visited Appellant numerous times after the incident and was not afraid of him; and (6) Moss has been physically assaultive on at least three prior occasions. But Appellant's arguments only point to matters to be resolved by the jury as the finder of fact.

This case is similar to *Denman v. State*, 193 S.W.3d 129 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). There, a jury found Denman guilty of aggravated assault, and Denman argued on appeal that the evidence was legally insufficient to support the conviction. *See id.* at 131, 132. Denman testified at trial that he had "kicked [the] complainant in the head in self-defense after a

12

struggle that began when she poked his foot with a knife and pointed a loaded shot-gun at him." *Id.* at 132. Denman also called six witnesses who testified that the complainant had assaulted or threatened him with weapons in the past. *Id.* The complainant did not testify at the trial because she was in a persistent vegetative state. *Id.* Holding that the evidence was legally sufficient to support the conviction, the court pointed to the jury's entitlement to "choose to believe all, some, or none of the testimony presented by the parties" and noted that "a defendant's own statement regarding his intent is not enough to render the evidence, without m0ore, insufficient." *Id.* at 132–33 (citing *Sells v. State*, 121 S.W.3d 748, 754 (Tex. Crim. App.), *cert. denied*, 540 U.S. 986 (2003) and quoting *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The court also stated, "Because the jury, by finding [Denman] guilty, implicitly rejected his self-defense theory, it necessarily chose not to believe the testimony concerning such." *Id.* at 132 (citing *Saxton*, 804 S.W.2d at 914).

Similar to the witnesses in *Denman*, Moss and Appellant gave conflicting testimony about the incident, and Appellant presented testimony from several witnesses to impeach Moss's credibility and to show that she had been physically aggressive in the past. But as in *Denman*, we must presume that the jury resolved the conflicts in favor of the prosecution and defer to that resolution. *See id.*; *see also Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778; *Williams*, 235 S.W.3d at 750. A rational trier of fact could have found Appellant guilty of assault beyond a reasonable doubt by choosing to believe the

13

evidence favoring conviction and by choosing to disbelieve the evidence favoring self-defense. *See Denman*, 193 S.W.3d at 132–33.

After viewing all the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of assault beyond a reasonable doubt and also could have found against Appellant on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291. We therefore overrule Appellant's first and second issues.

## IV. Exclusion of Evidence of Alleged Bias or Motive

Appellant contends in his third issue that the trial court abused its discretion by excluding evidence of Moss's alleged bias or motive. Appellant sought to question Moss and to give his own testimony about a checking account Moss opened and used for the year before the assault, and he argues that this evidence revealed Moss's bias or motive for testifying against him because it showed that Moss had a pre-existing plan to divorce him before she accused him of assault. *See* U.S. Const. amend. VI; Tex. R. Evid. 613(b).

### A. Applicable Law

We review a trial court's decision to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not abuse its discretion as long as the decision to exclude the evidence is within the zone of reasonable disagreement.

*Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1991) (op. on reh'g).

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment right to confront witnesses includes the right to cross-examine them to attack their general credibility or to show their possible bias, self-interest, or motives in testifying. *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)).

The Texas Court of Criminal Appeals has held:

[t]he possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him.

*Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009) (citing *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)).

A defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify, and therefore, the scope of appropriate cross-examination is necessarily broad. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). But this does not mean that a defendant can explore every possible line of inquiry. *Walker v. State*, 300 S.W.3d 836, 844 (Tex. App.—Fort Worth 2009, pet. ref'd). Rather, "the Confrontation Clause guarantees an *opportunity* for effective cross-

15

examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 295 (1985); *see Walker*, 300 S.W.3d at 844–45. Thus, trial courts have the discretion to limit cross-examination as inappropriate for a number of reasons, including the prevention of harassment, prejudice, confusion of the issues, and marginally relevant interrogation. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986)).

Each Confrontation Clause issue is viewed on a case-by-case basis. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). "The proponent of evidence to show bias must show that the evidence is relevant. The proponent does this by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party." *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004), *cert. denied*, 544 U.S. 1050 (2005) (citing *Carpenter*, 979 S.W.2d at 634). The trial court does not abuse its discretion by excluding evidence of alleged bias or motive if the defendant's offer of proof does not establish the required nexus. *See id.* at 111–12.

## B. Applicable Facts

Appellant argues that the trial court abused its discretion by refusing to allow cross-examination of Moss and testimony from Appellant concerning Moss's plan to divorce Appellant—as shown by evidence of the separate

16

checking account Moss had opened and used for the year before the incident—and that the refusal violated his Sixth Amendment right to confrontation and his right under rule of evidence 613(b) to expose Moss's bias.

Outside the jury's presence, Moss testified that with Appellant's agreement, she handled the finances in their family; that she wrote the checks; that she and Appellant had a joint checking account; that all of Appellant's paycheck was deposited into the joint checking account; that half of her paycheck was deposited into the joint checking account; and that the other half of her paycheck was deposited into her personal checking account. Moss testified that she had had her personal checking account with Wells Fargo since 1993 and that all of her paycheck went into that account until she and Appellant were married. After they were married, Moss and Appellant opened a joint checking account at Wells Fargo, but after Appellant's ex-wife started working at Wells Fargo, Appellant instructed Moss to close the account and open another one at Chase so that his ex-wife would not know their incomes. Moss also testified that she closed her personal account at Wells Fargo and opened another one at Chase at about the same time.

Moss testified that she began depositing her paycheck into her separate account in December 2007, but Moss testified that she did so because Appellant instructed her to do so. She said that Appellant's ex-wife and the Attorney General's office were seeking to increase Appellant's child support obligation, and she said Appellant told her to open the separate account so that his ex-wife

17

and the Attorney General could not touch her income and could only base any child support orders off of his income alone. However, although Appellant could not sign on her separate checking account, Moss testified that she paid their bills—such as the house payment, car payment, insurance, and other community expenses—from both the joint checking account and her separate checking account. Moss specifically identified payments for a motorcycle and motorcycle insurance, the water bill, the cable bill, and the light bill that she paid from her separate checking account.

When questioned by the prosecution outside the presence of the jury, Moss testified that even though it was Appellant's contention that she had been planning to divorce him for a year before the assault, Appellant was the one who filed for divorce. After Appellant's counsel represented to the trial court that Appellant had only learned of the separate checking account a month before trial, the following exchange occurred:

> [Court]: Okay. Just as we stand right now, does the State have any objection to the evidence toward – about the – the checking accounts?
>
> [Prosecutor]: Yeah, all of it, Your Honor. It's not relevant to what happened on November 2nd, 2008.
>
> [Court]: Okay. At this point, I'm going to sustain the objection. We're not going to try the divorce proceedings here. We're going to stick to the facts here, and you're getting way far afield. I mean, if you've got some good evidence that she's got a plan or something, bring it back to me, but you're not even close right now.

Appellant did not make any argument at the time concerning the trial court's decision to exclude the evidence of the separate checking account, but

18

Appellant did revisit the issue during his case-in-chief. At that time, and also outside the jury's presence, Appellant testified that Moss took his house key away in October 2007 and that he moved in with his mother for a few weeks but moved back in with Moss before Thanksgiving. Appellant said that he moved back because he wanted to be home and because Moss wanted him to come home. When asked by his attorney how he knew Moss wanted him to come home, Appellant testified, "She seduced me. She had sex with me and told me she wanted me to come home."

Appellant also testified that he learned from Moss's sister a month before trial that Moss, from November 2007 through November 2008, "had been stealing money from [him] and making extra house payments and extra car payments to get ahead on her bills." Appellant testified that he checked his financial statements for the previous two years and found that Moss had stopped depositing her paychecks into the joint account on November 30, 2007, but had continued making the car payments, the home and auto insurance payments, the electricity payments, and other payments from the joint checking account. Appellant testified that this allowed Moss to financially plan ahead to divorce him because she was building a separate account. Appellant testified that he "wouldn't have been very happy about it" had he found out about Moss's separate checking account in November 2008, that it was "a breach of trust," and that it "could have" led to divorce. Finally, Appellant admitted that he had been the one to file for divorce after his assault arrest, but when his attorney asked

19

why he filed for divorce, Appellant explained, "To protect the children from CPS, because CPS was trying to take the kids away. And if I was getting a divorce and leaving the house, there wouldn't be a problem. The kids and [Moss] would be okay."

After Appellant gave other testimony outside the jury's presence concerning matters not at issue in this appeal, the State objected on relevancy grounds to Appellant's testimony concerning the separate checking account, and the following exchange occurred:

> [Appellant's Counsel]: Motive is what that goes to, the motive for seducing him to come back when he had moved out. He was gone November of '07, and I think that's one key that – that the jury needs to hear, is he had moved out of the house November of '07. She seduced him into coming back. She had a motive because she opened a new – a different checking account and started putting her paycheck into the new checking account. She was in a much better position financially, planning-wise. She had paid ahead on some things and other things, and I'll get into some of that back with her when we call her back. But –
>
> [Court]: I – I'm going to sustain the State's objection. That's – that's just stretching your pattern way too far. I don't see any – any evidence of a plan of – even if there was a plan of divorce, the plan had to be towards the fact that there was – my plan is that I'm going to get him to assault me or claim that there's an assault, and that's going to be part of it. That – that's too far. The relevancy fact –
>
> [Appellant's Counsel]: It – it –
>
> [Court]: I don't want an argument over it. I'm just telling you, it's not coming in.
>
> [Appellant's Counsel]: I don't want to argue it, Your Honor, and I don't – I don't mean for anything I say to be taken as an argument. I just want to make sure that the record's clear, and that's all I'm trying to do. My purpose for introduction –

[Court]: Uh-huh.

[Appellant's Counsel]: – is to show that there was a potential motive for getting him to come back and, secondly, that there's a pressure point, because at some point, he's going to discover that situation. So there was a stress point coming up in their marriage that she may have felt like she needed to avoid, and that stress point would be – also be evidence to the jury if that testimony were allowed.

[Court]: I'm still going to sustain the State's objection as to that. It's just too far-reaching. The dots aren't connected. To me, it doesn't show any motive at all. There's no clear pattern there.

Appellant subsequently called Moss to the stand during his case-in-chief, but he did not ask her any further questions concerning a checking account or a plan to divorce him.

## C. Discussion

As the proponent of the evidence concerning Moss's alleged bias or motive, Appellant had the burden to demonstrate a nexus or logical connection between the separate checking account and Moss's alleged plan to divorce him and her potential motive to testify against him. *Woods*, 152 S.W.3d at 111–12 (citing *Carpenter*, 979 S.W.2d at 634). The trial court allowed Appellant's counsel considerable leeway to fully explore the evidence concerning the separate checking account through both Moss and Appellant, but the record does not establish the necessary nexus. *See id.*

Appellant's failure to establish the required nexus is illustrated by two cases in which the appellant did establish a logical connection between the proffered evidence and the witness's potential motive. *See Ryan v. State*, No.

21

04-08-00594-CR, 2009 WL 2045211 (Tex. App.—San Antonio July 15, 2009, no pet.) (mem. op., not designated for publication); *McDaniel v. State*, 3 S.W.3d 176 (Tex. App.—Fort Worth 1999, pet. ref'd). In *Ryan*, an assault case, the court held that the trial court erred by limiting cross-examination of the complainant, Ryan's ex-wife, about custody of their oldest child. *Ryan*, 2009 WL 2045211, at *3–4. The complainant testified that when she and Ryan had previously separated, the family court had awarded Ryan custody of their oldest child, and Ryan established through other testimony that after he was arrested for assaulting her, the complainant took both children, moved out of the residence, and did not return the oldest child to Ryan. *Id.* at *4. But the trial court did not permit Ryan to question the complainant about any subsequent custody disputes between her and Ryan or the effect of any such disputes on her testimony. *Id.* Recognizing that a family violence conviction has statutory consequences in custody proceedings involving the perpetrator's children, the court held that "[q]uestions regarding custody proceedings would be relevant to [the complainant]'s motivation to exaggerate her testimony at trial." *Id.* Ryan thus established a nexus between the cross-examination he sought and the complainant's potential bias because there is a logical connection between the complainant's desire to have custody of her oldest child and her motivation to exaggerate her testimony against him. *See id.*

In *McDaniel*, a forgery case, we held that the trial court erred by preventing McDaniel from cross-examining the complainant, her ex-husband, about a

22

$9,480 child support arrearage judgment she held against him. *See* 3 S.W.3d at 180–82. We explained that the trial court had abused its discretion by disallowing cross-examination about the outstanding child support judgment because it had applied the wrong relevancy test. *Id.* at 181. We stated that "relevance, in this instance, is not measured by whether the existence of a large monetary judgment against the complainant makes the existence of Appellant's intent [to forge the complainant's signature] six years earlier more probable or less probable, but by whether the evidence will help the jury assess the credibility of the complainant and assess the probative value of his testimony on direct." *Id.* The trial court abused its discretion in *McDaniel* because there was a logical connection between the child support judgment against the complainant and his motivation to testify for the State against the woman who held the judgment against him. See *id.* at 181 & n.5.

But the logical connection that existed in *Ryan* and *McDaniel* is, at best, extremely attenuated in this case. When arguing that the evidence was admissible, Appellant's counsel suggested that Moss first made Appellant move out of her house in 2007, then opened the separate checking account, and later "seduced" Appellant into moving back into the house, only to then decide to accuse Appellant of assault because she was concerned that Appellant would discover the checking account and divorce her. Outside the jury's presence, the trial court permitted Appellant to extensively cross-examine Moss and to give his own lengthy testimony concerning the separate checking account, but the trial

23

court did not see a connection between the separate checking account and Moss's motive or bias, stating that "[i]t's just too far-reaching. The dots aren't connected. To me, it doesn't show any motive at all." *See Irby v. State*, 327 S.W.3d 138, 153–54 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 904 (2011) (noting that trial court gave Irby three different hearings outside the jury's presence and holding that Irby "failed to make a logical connection" between the complainant's testimony and his juvenile probationary status to permit cross-examination on the probationary status to show motive for fabrication).

"A trial court has the discretion to limit testimony that may confuse the issues or be only marginally relevant." *Walker*, 300 S.W.3d at 846 (citing *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435, and *Felan v. State*, 44 S.W.3d 249, 254 (Tex. App.—Fort Worth 2001, pet. ref'd)). Whether Moss had a separate checking account was only a marginally relevant issue and does not necessarily indicate that she had a reason to provide false testimony. Although we are mindful of Appellant's right to pursue all avenues of cross-examination reasonably calculated to expose motive, bias, or interest in a witness to testify, *see Carroll*, 916 S.W.2d at 497, 500, we agree with the trial court's determination that Appellant failed to show a logical connection between the evidence of the separate checking account and Moss's alleged bias or motive; at a minimum, the trial court's decision is within the zone of reasonable disagreement. We hold that the trial court did not abuse its discretion by refusing to permit cross-examination of Moss and testimony from Appellant concerning the separate checking

24

account, and we therefore overrule Appellant's third issue. See *Montgomery*, 810 S.W.2d at 380 (holding that a trial court does not abuse its discretion when its decision to admit or exclude evidence is within the zone of reasonable disagreement).

## V. Refused Jury Instruction on Confinement

Appellant argues in his fourth issue that the trial court erred by refusing to instruct the jury on the defense of confinement because the defensive issue was raised by the evidence. *See Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) (reiterating the well-settled rule that a defendant is entitled to an instruction on any defensive issue raised by the evidence without regard to the strength or credibility of the evidence raising it).

### A. Standard of Review

Appellate review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error occurred. *Abdnor*, 871 S.W.2d at 732. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id*. at 732–33.

### B. Discussion

Appellant testified that Moss pushed him "hard," that he then grabbed both of her arms, and that he released her arms when she stopped struggling and asked him to stop. The trial court submitted a self-defense instruction, but

Appellant argues that his testimony also raised the defense of confinement. The State responds that even if confinement is a defense separate and apart from self-defense, Appellant was not entitled to an instruction on confinement because it was not raised by the evidence. For purposes of our analysis, we assume without deciding that confinement is a defensive issue or affirmative defense distinct from self-defense.

Penal code section 9.02 provides that "[i]t is a defense to prosecution that the conduct in question is justified under this chapter." Tex. Penal Code Ann. § 9.02 (West 2011). Penal code section 9.31 permits the use of force "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). And as relevant here, section 9.03 states that "[c]onfinement is justified when force is justified by this chapter if the actor takes reasonable measures to terminate the confinement as soon as he knows he safely can." *Id.* § 9.03 (West 2011). However, "confinement" is not defined in the penal code.

When construing a statute, reviewing courts seek to effectuate the legislature's intent in enacting it. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991); *Adams v. State*, 270 S.W.3d 657, 660 (Tex. App.—Fort Worth 2008, pet. ref'd). The plain meaning of the words should be applied unless the language is ambiguous or application of the statute's plain language would lead to an absurd result that the legislature could not have intended. *Boykin*, 818 S.W.2d at 785; *Adams*, 270 S.W.3d at 660.

Only two Texas cases have addressed section 9.03, and neither addresses the present issue of whether momentarily grabbing and holding another person during a struggle constitutes confinement under section 9.03. *See generally Adelman v. State*, 828 S.W.2d 418, 422–23 (Tex. Crim. App. 1992); *Kenny v. State*, 292 S.W.3d 89, 93 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). In *Adelman*, the court of criminal appeals held that legally sufficient evidence supported Adelman's false imprisonment conviction and the jury's rejection of her confinement defense because she bound her mentally-ill son with handcuffs and a foot shackle but did not take reasonable measures to terminate the confinement as soon as she safely could. *See* 828 S.W.2d at 422–23. In *Kenny*, Kenny testified that he bound the complainant's wrists with rope to prevent her from driving while intoxicated, but the court held that Kenny was not entitled to defensive instructions on confinement, protection of life or health, or necessity because there was no evidence of immediate necessity or imminent harm. *See* 292 S.W.3d at 101; *see* Tex. Penal Code Ann. § 9.03; *id.* §§ 9.22, .34 (West 2011).

Citing *Kenny*, Appellant argues that because the trial court in this case instructed the jury on the law of self-defense, a separate instruction on confinement "logically followed." *See* 292 S.W.3d at 101–02. The court stated that "because [Kenny] concedes that an instruction regarding confinement as justifiable force under section 9.03 would only be appropriate if an instruction under section 9.34 were, we conclude that, by extension, the trial court properly

27

refused to instruct the jury on confinement as justifiable force under section 9.03." *Id.* However, the court had previously held that Kenny's acts were not justified because there was no imminent harm, and the confinement involved binding the complainant's wrists together with a rope to prevent her from driving while intoxicated. *Id.* at 93. *Kenny* is unhelpful here because it did not address the conduct necessary to constitute confinement under section 9.03.[8] *See id.* at 100–02.

Because there are no relevant case law interpretations of section 9.03, we turn to dictionary definitions of "confinement" to determine whether briefly grabbing and holding a person during a struggle constitutes confinement under section 9.03. *See Ramos v. State*, 303 S.W.3d 302, 306 (Tex. Crim. App. 2010) (stating that courts may consult standard dictionaries "[w]hen attempting to discern [the] fair, objective meaning" of an undefined term); *see also* Tex. Penal Code Ann. § 1.05(a) (West 2011) (providing that courts are to construe penal code provisions "according to the fair import of their terms, to promote justice and effect the objectives of the code"). In that regard, various dictionary definitions suggest that "confinement" requires something more than briefly grabbing and holding another person's arms during a struggle. First, Black's Law Dictionary defines "confinement" to mean "the act of imprisoning or restraining someone," but it gives "solitary confinement" as an example of confinement. Black's Law

---

[8]*Adelman* is similarly unhelpful because it turned not on whether Adelman confined her son but on whether she ended the confinement as soon as it was safe for her to do so. *See* 828 S.W.2d at 422–23.

Dictionary 340 (9th ed. 2009).  Thus, although the definition includes restraining someone, the extent of restraint necessary to constitute confinement is unexplained, and the example of solitary confinement implies that the common legal definition of confinement does not include merely grabbing and holding another person during a struggle.  Indeed, the Court of Criminal Appeals has noted that "imprisonment" is confinement's "first meaning in the law" and that "confinement" means the "state of being confined; shut in; or imprisoned."  *Lebo v. State*, 90 S.W.3d 324, 327 & n.7 (Tex. Crim. App. 2002) (quoting Black's Law Dictionary 270 (5th ed. 1979)).[9]

Further, non-legal dictionaries also define "confinement" as something more than grabbing and holding a person during a struggle.  For example, Webster's Third New International Dictionary defines "confine" as "to hold within bounds," "restrain from exceeding boundaries," "to keep in narrow quarters," or "imprison," and the Oxford English Dictionary defines "confine" to mean "to shut up, imprison, immure, put or keep in detention, to relegate to certain limits."  Webster's Third New International Dictionary 476 (2002); Oxford English Dictionary 805–06 (24th ed. 1983).  Again, each of these sources define

---

[9]*Lebo* is both factually and legally distinguishable from this case.  It addressed whether a person is entitled to release on bond pending appeal after a jury assesses a term of imprisonment but recommends community supervision and the trial court follows the jury's recommendation.  *See id.* at 325–26.  We note it here merely as context for the commonly understood meaning of confinement.

29

"confine" or "confinement" as something more than momentarily grabbing and holding another person during a struggle.

Moreover, other justification statutes support an interpretation of confinement as more than merely grabbing and holding another person during a struggle. *See Ramos v. State*, 264 S.W.3d 743, 750 (Tex. App.—Houston [1st Dist.] 2008), *aff'd*, 303 S.W.3d 302 (Tex. Crim. App. 2010) (stating that the undefined term "should not be read in a vacuum, but rather it should be read within the context of the statute in which it appears"). Penal code section 9.31 permits the use of force when the actor "reasonably believes the force is immediately necessary" to protect him against another's use or attempted use of force, and section 9.03 in turn provides that confinement is justified when force is justified. *See* Tex. Penal Code Ann. §§ 9.03, .31. But there is no discernable distinction between the force Appellant allegedly used to grab and hold Moss in self-defense during the struggle and the force he allegedly used to grab and hold Moss during the struggle to "confine" her. In other words, while there are undoubtedly factual scenarios in which a person could both act to confine an aggressor to prevent an attack and also use force in self-defense, Appellant's testimony is not evidence that he confined Moss within the meaning of penal code section 9.03. If the legislature intended confinement under section 9.03 to include merely restraining a person by briefly grabbing and holding the person during a struggle, it could have included both confinement and restraint within section 9.03 or defined confinement to include restraint, but it did not do so. *See*

30

*generally* Tex. Penal Code Ann. § 20.01(1) (West 2011) (defining "restrain" for purposes of kidnapping and unlawful restraint offenses to mean "to *restrict a person's movements without consent*, so as to interfere substantially with the person's liberty, by moving the person from one place to another *or by confining the person*" (emphasis added)).

The disposition of this case does not require that we assign a definite meaning to "confinement" within the context of penal code section 9.03. However, we hold that "confinement" as contemplated by the legislature in section 9.03 was not satisfied in this case. Accepting Appellant's testimony as true, Appellant's act of grabbing and holding Moss during their physical altercation was the use of force contemplated by penal code section 9.31 (self-defense)—not confinement contemplated by penal code section 9.03 (confinement), and the jury in this case was given an instruction that required acquittal if it found that Appellant "grabbed or pushed or threw" Moss in self-defense. There was no evidence that entitled Appellant to a separate defensive instruction on confinement, and the trial court did not err by refusing to submit the separate instruction. We overrule Appellant's fourth issue.

## VI. Allocution

Appellant argues in his fifth issue that the trial court erred by failing to afford him the right of allocution pursuant to code of criminal procedure article 42.07. *See* Tex. Code Crim. Proc. Ann. art. 42.07 (West 2006). However, Appellant was required to object to the trial court that he was denied his right to allocution under article 42.07 in order to preserve that complaint for appellate review. *Eisen v. State*, 40 S.W.3d 628, 636–37 (Tex. App.—Waco 2001, pet. ref'd); *see also Aguilar v.* State, No. 13-09-00613-CR, 2010 WL 2432095, at *1 (Tex. App.—Corpus Christi June 17, 2010, no pet.) (mem. op., not designated for publication); *Matthews v. State*, No. 05-08-01250-CR, 2009 WL 824769, at *6 (Tex. App.—Dallas Mar. 31, 2009, pet. ref'd) (mem. op., not designated for publication). Because Appellant did not voice any objection to the trial court's alleged failure to permit him allocution pursuant to article 42.07, Appellant failed to preserve his fifth issue for appellate review, and we overrule it. *See* Tex. R. App. P. 33.1(a); *Eisen*, 40 S.W.3d at 636–37; *Matthews*, 2009 WL 824769, at *6.

## VII. Conclusion

Having overruled each of Appellant's five issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL, JJ.

PUBLISH

DELIVERED: June 16, 2011