

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-13-00593-CR

WOODY GERARD SOLOMON                                    APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NO. 0466345R

----------

## MEMORANDUM OPINION[1]

----------

Appellant Woody Gerard Solomon appeals the trial court's order finding that results from postconviction DNA testing are inconclusive and therefore not favorable to a challenge of his 1992 conviction for aggravated sexual assault. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background Facts**

In 1992, a grand jury indicted appellant, who was then twenty-one years old, for three counts of aggravated sexual assault against C.C. (Candice), a child younger than seventeen years old.[2] The second count of the indictment alleged that on September 24, 1991, appellant had penetrated Candice's mouth with his sexual organ while placing her in fear of death or serious bodily injury. The trial court appointed counsel to represent appellant. Following his not-guilty plea, a jury convicted him of count two, and the trial court sentenced him to forty years' confinement.

Appellant appealed, and we affirmed the conviction. *Solomon v. State*, 854 S.W.2d 265, 270 (Tex. App.—Fort Worth 1993, no pet.). In overruling his argument that the evidence was insufficient to support the conviction, we described the evidence from his trial as follows:

> The State produced several witnesses to prove its case: (1) [Candice], the complainant; (2) C.W., a friend of the complainant; (3) R.Y., a friend of the complainant; (4) Kelly Ray Jobe, an acquaintance of Solomon's; (5) Bradley Ray Sargent, Solomon's cell-mate; (6) Arvin Royce Carter, a detective for the River Oaks Police Department; and (7) Daniel Chisholm, a criminal investigator for the River Oaks Police Department.
>
> The defense produced two witnesses: (1) Gloria Solomon Williams, Solomon's mother; and (2) Solomon himself.

---

[2]To protect the victim's anonymity, we will use an alias to refer to her. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[Candice] testified as follows: Early in the morning of September 24, 1991, fifteen-year-old [Candice] awoke and felt something grabbing her left leg and crotch area. She looked at her clock and saw that it was 5:24 a.m. [Candice] then saw a male figure kneeling beside her bed, whom she thought might be her boyfriend. The person placed a pair of shorts over [Candice's] face, covering her eyes, put a knife to her throat, and threatened to kill her if she did not cooperate. [Candice] touched the person's head, and felt curly hair. [Candice] knew then the person was not her boyfriend because her boyfriend had straight hair. [Candice's] assailant forced her to lie on her bed while he sexually assaulted her. [Candice] could not see her attacker during this time because he kept a pillow over her eyes.

At around 7:20 a.m., [Candice's] friends, C.W. and J.W., came to [Candice's] window, as usual, on their way to ride the school bus. [Candice's] attacker left [Candice's] room, instructing her to keep her eyes covered. Once her bedroom door was shut, [Candice] got up, put a sheet around herself, opened the door, and saw her assailant running down the hall. Fearing for her life, [Candice] shut her door again. [Candice] heard the person run out the back door.

[Candice] described her assailant as a black male of medium build and medium-tall height. He wore a black cotton T-shirt and brown or beige shorts like Docker shorts. Although [Candice] testified that she did not get a good look at his face, she identified the person in court as Solomon.

Fourteen-year-old C.W. gave the following testimony: Around 7:00 a.m. on September 24, 1991, she walked to [Candice's] house on her way to the bus stop. It was neither "real dark" nor "real bright" outside, and there were no lights on in [Candice's] house. C.W. noticed the screen from [Candice's] window lying next to the window, and the window was up.

When she looked in the window, C.W. saw two people on [Candice's] bed. She was unable to see clearly who they were because it was dark. Commotion followed, after which C.W. heard [Candice's] back door slam.

C.W. then saw someone on a ten-speed bicycle leaving the next-door neighbor's driveway. He was a black male, 19 or 20 years old, rather tall, muscular, wearing a black shirt and beige shorts.

3

C.W. had never seen the man before. C.W. observed the man's face from about ten yards away. At trial, C.W. identified the man she saw at [Candice's] house as Solomon.

Daniel Chisholm testified that, on the day of the offense, C.W. identified Solomon from a six-man photospread as the person C.W. had encountered earlier that morning. When Chisholm went to arrest Solomon, a ten-speed bicycle was lying in front of Solomon's house.

Fifteen-year-old R.Y. testified as follows: On September 24, 1991, at around 7:00 a.m., he was taking out the trash when he saw a man riding away from [Candice's] house on a dark-colored ten-speed bicycle at a high rate of speed. The man passed in front of R.Y. as R.Y. was standing in his driveway, about twenty feet away. R.Y. described the man as tall, skinny, wearing dark clothes, with short hair. R.Y. thought the man was black. R.Y. glimpsed [at] the man from the side and also saw a little of the front of the man's face. At trial, R.Y. stated the man he saw on the bike looked like Solomon.

Kelly Ray Jobe testified: He lived two houses down the street from [Candice] and knew her personally. Jobe had met Solomon on several occasions prior to September 24, 1991, and Solomon's transportation was usually a yellow ten-speed bicycle. On one occasion, Solomon was at Jobe's house when [Candice] was walking across the street. Solomon said he would like to have sex with [Candice]. Another time Solomon said he would like to "fuck" [Candice].

Bradley Ray Sargent gave the following testimony: At the time of trial, he was incarcerated in the Texas Department of Criminal Justice for cocaine possession.[3] His sentence for the cocaine possession was the result of a plea bargain. Sargent also had two prior convictions for burglary of habitation and had successfully completed probation in Oklahoma for forgery.

While awaiting trial on cocaine possession charges, Sargent shared a jail cell with Solomon for two weeks. During that time Solomon described in detail his sexual assault on [Candice].

---

[3]Sargent testified in appellant's trial that the State had not offered any deal regarding his incarceration in exchange for his testimony.

Sargent decided to tell the police about what Solomon had told him because he "thought that was sick."

Arvin Royce Carter testified: The day of the offense, he prepared a photospread and showed it to R.Y. Carter asked R.Y. if he recognized the person he saw on the bicycle in the photospread. R.Y. told Carter [that] Solomon's picture looked a lot like the person R.Y. saw ride a bicycle past his house. R.Y. also wrote "It looks a lot like him" next to Solomon's picture.

On September 30, 1991, Carter escorted Solomon to the telephone. At that time, Solomon asked if he was going to get his tennis shoes back. Carter told Solomon his shoes were in the property room. Solomon responded, "You mean I left footprints?" and then rephrased his question.[4]

Solomon's fingerprints were found on the inside of the bent screen that was removed from [Candice's] window. The law enforcement officers who located and identified the prints both testified that it was impossible to pinpoint the time when the fingerprints were made. Once made, fingerprints can remain on an object for days, weeks, or even years.

Gloria Solomon Williams testified as follows: Around 4:30 a.m. on September 24, 1991, Solomon went into the bedroom he sometimes shared with his mother (Williams) and turned the light on, waking Williams up. Solomon went to bed at that time, and Williams eventually went back to sleep. Solomon was still in bed when Williams got up at 5:30 or 6:00 a.m. and when she left the house a few minutes before 7:00 a.m.

Solomon denied sexually assaulting [Candice]. Solomon testified that he arrived home between 3:30 and 4:00 a.m. on September 24, 1991. Solomon further testified that he had been at [Candice's] residence two to four years before the assault to visit a girlfriend who was living there at the time.

*Id.* at 266–68.

---

[4]Carter testified that after asking the initial question about footprints, appellant realized what he had said, grinned, and asked, "I mean, did the person that did it leave footprints?"

Despite the evidence linking him to Candice's sexual assault, including his apparent admissions to Sargent and Carter, in 2001, appellant began seeking DNA testing under chapter 64 of the code of criminal procedure.[5]  Eventually, through a series of orders, the trial court required DNA testing of biological materials from Candice's sexual assault kit,[6] a bed sheet, two pillow cases, white shorts with blue trim, a bottom bed sheet, a pair of torn panties, a pair of white shorts, a white and blue shirt, and certain hairs.  Results of the testing excluded appellant as a contributor to DNA on Candice's vaginal swab; showed that collected pubic hairs were visually similar to Candice's pubic hair specimen; showed no sperm or semen on the vaginal or oral smear slides; showed that "no conclusions" could be made about the source of DNA (other than Candice's DNA) on a hair from a bed sham; excluded appellant as a contributor to DNA found on Candice's shorts, a hair on a sheet, and Candice's pubic hair combings; and showed no male DNA above detection levels on a hair from a bed sham.

The State filed motions that asked the trial court to enter a nonfavorable finding on the results of the DNA tests, and appellant asked for a favorable finding.[7]  In the State's motions, it contended that the results of the testing were

---

[5]*See* Tex. Code Crim. Proc. Ann. arts. 64.01–.05 (West 2006 & Supp. 2014).

[6]This kit contained various biological samples taken from Candice.

[7]In appellant's motion for a favorable finding, he summarized the results from testing, stating that "DNA testing of the alleged victim's vaginal swab excludes [appellant] as a contributor; and . . . the hairs collected from the alleged

6

inconclusive and therefore unfavorable to appellant. It argued that the mere absence of appellant's DNA from items found at the scene (as opposed, for example, to the presence of another male's DNA on the items) did not undermine his conviction. "Put simply," the State argued, "the fact that the only obtained DNA results are attributable to the victim does not establish [appellant's] innocence."

From 2010 through 2013, the trial court held a series of evidentiary hearings. At a 2010 hearing, appellant testified that his fingerprints had been found on the bent (and removed) screen of the window at Candice's house because prior to Candice moving in, he had been in the house while "mess[ing] around" with a girl named Becky Cromwell.[8] Appellant challenged the three eyewitnesses (including Candice) who linked him to the crime and testified that the presence of his fingerprints on the screen caused the police to "zoom in on [him] without trying to find anybody else." Appellant also testified that Sargent had known about details of the offense because he had overheard one of appellant's friends talking about the crime, not because appellant had confessed

victim's sham and sheet do not match [appellant's] hair." The State asserts that the "testing results simply matched evidence collected in the sexual assault kit and bed hairs to [Candice]."

[8]In a 2010 hearing, appellant testified that he never talked to Becky's parents. In his trial, however, appellant testified that he had seen and talked to her parents. At other points in the reporter's record, Becky's last name is referred to as "Cornwall."

to the crime while confined. Appellant denied ever talking to Jobe about wanting to have sex with Candice.

At a February 2012 hearing, David Duff testified that on twenty or more occasions in approximately 1988 and 1989, he went with appellant to visit Becky at the house that Candice later moved into. Duff testified that while Becky lived there, an adult named Richard also lived there. He surmised that his fingerprints could be in what once was Becky's bedroom and later became Candice's bedroom. Duff said that Becky was a girlfriend to "Little Johnny"; he did not know of her having a romantic relationship with appellant.

In March 2012, Richard Pacheco testified that "somewhere" within the timeframe of 1988 and 1989, he lived in the house where Candice's sexual assault later occurred.[9] He stated that only he, his wife, and two preschool daughters lived in the house. He testified that no one named Becky lived with him there and that appellant never visited the house while he lived there.

After the final hearing, the trial court signed an order finding that the DNA test results were inconclusive and therefore not favorable to appellant. The court explained, "[U]nder the factual circumstances of this case, the absence of [appellant's] DNA from the vaginal swab and the [pubic] hair combing do not create a reasonable probability that the defendant would not have been

---

[9]Pacheco later said that he moved out of the house in 1990 or 1991.

convicted had the test results been available at the time of trial." Appellant brought this appeal.

## The Propriety of the Trial Court's Adverse Finding

Appellant argues only that the trial court erred by ruling that the results of the forensic DNA tests were not favorable to him. A convicted person may submit a motion for forensic DNA testing of evidence containing biological material to the convicting court. Tex. Code Crim. Proc. Ann. art. 64.01(a-1). If the motion meets the requirements of chapter 64 and the convicting court orders testing, the court must then review the results, hold a hearing, and "make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." *Id.* arts. 64.03, .04; *see Glover v. State*, 445 S.W.3d 858, 862 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (explaining that a "favorable" DNA test must affirmatively cast doubt on the validity of the conviction and not merely "muddy the waters") (citing *Ex parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011)); *Cate v. State*, 326 S.W.3d 388, 390 (Tex. App.—Amarillo 2010, pet. ref'd) ("Inconclusive evidence does not make innocence more or less probable."); *Baggett v. State*, 110 S.W.3d 704, 707 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (stating the same). The convicted person may appeal if the court makes a finding that is unfavorable. *See* Tex. Code Crim. Proc. Ann. art. 64.05; *Whitfield v. State*, 430 S.W.3d 405, 407, 409 (Tex. Crim. App. 2014).

9

In our review of the trial court's finding, we afford almost total deference to that court's determination of issues of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor, but we review de novo other application-of-law-to-fact issues. *See Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (stating the standard for reviewing a trial court's decision on whether to require testing); *see also Gutierrez*, 337 S.W.3d at 894 n.34 (citing *Rivera*). The ultimate question of whether a reasonable probability exists that exculpatory DNA tests would have caused appellant to not be convicted "is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed *de novo*." *Rivera*, 89 S.W.3d at 59; *see Glover*, 445 S.W.3d at 861.

Here, the DNA test results returned mostly with positive identifications only of the victim's DNA.[10] One test indicated the presence of an additional DNA contributor but could not exclude or include appellant as that contributor. Neither the documents in the clerk's record nor evidence within the reporter's record indicate that any test established the presence of a male's DNA that did not match appellant's DNA. Thus, while the test results did not add any further corroboration for appellant's guilt, they also did not affirmatively link someone else to the crime or conclusively exclude appellant's commission of it.

---

[10]In his brief, appellant summarizes the test results by stating, "DNA testing of the alleged victim's vaginal swab excludes the [a]ppellant as a contributor[,] and . . . the hairs collected from the alleged victim's sham and sheet do not match the [a]ppellant's hair."

10

Appellant argues on appeal that had he "committed the acts as alleged by [Candice], it is likely that his DNA would have been present on her shorts and his hair would have been present on her bed sham. The fact that DNA testing shows otherwise would have been persuasive evidence in [a]ppellant's favor at his trial."[11] But under the facts here, we cannot conclude that the trial court should have issued a finding that was favorable to appellant based only on the absence of his DNA from the crime scene. *See Rivera*, 89 S.W.3d at 60 & n.20; *Ard v. State*, 191 S.W.3d 342, 347 (Tex. App.—Waco 2006, pet. ref'd) ("The mere absence of the victim's DNA material on the gun would not establish Ard's innocence by a reasonable probability.").

In a substantial part of appellant's brief, instead of focusing on the effect of the test results, he challenges the incriminating value of the evidence admitted at his 1992 trial and compares that evidence to new testimony elicited during the hearings on his postconviciton motions. For example, he argues that the eyewitness identification of him as Candice's attacker is "suspect," that he "presented credible alibi testimony" at his trial, and that he provided credible

---

[11]Regarding the absence of appellant's DNA from Candice's vaginal swab and smear, appellant recognized in his 2010 testimony that Candice had previously testified that there was little penile contact with her sexual organ and that there was no ejaculation. Candice testified at trial that her attacker did not ejaculate and that he "tried to force [her] legs open, . . . [but she] kept moving and wouldn't be still." Melissa Haas, who supervises DNA analysis with the Texas Department of Public Safety, testified that DNA is not always transferred when a penis contacts a female sexual organ and that ejaculation makes the finding of a male's DNA more likely.

11

testimony about why his fingerprints were found in Candice's room. But an appellant's attempt to merely attack the inculpating persuasiveness of nonbiological evidence from his trial cannot support a favorable finding under article 64.04.[12] *See Glover*, 445 S.W.3d at 862 ("Appellant attempts to point out weaknesses in the evidence surrounding his conviction . . . . All of this information was before the jury when it found him guilty, however."); *see also Perez v. State*, No. 14-10-00959-CR, 2011 WL 2683189, at *3 (Tex. App.—Houston [14th Dist.] July 12, 2011, no pet.) (mem. op., not designated for publication) (relying on incriminating evidence from the appellant's trial to conclude that postconviction DNA results would not have changed the result of the trial); *Cate*, 326 S.W.3d at 390 ("[A] reasonable probability of innocence does not exist if there is sufficient evidence, independent of the DNA evidence in question, to establish the appellant's guilt."). Also, a test result that excludes the appellant as a contributor to biological material may not warrant a favorable

---

[12]In his closing argument in the 1992 trial, appellant highlighted his alibi and challenged the eyewitness accounts, Sargent's testimony about appellant's jailhouse confession, and the persuasiveness of the fingerprint evidence. The jury implicitly rejected these challenges and appellant's testimony by convicting him. *See Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.). In deciding to make a nonfavorable finding on the results of appellant's DNA tests, the trial court explained that its role was

> not [to decide] whether [appellant] should be given a new trial based upon . . . sufficiency of the evidence, but . . . if the DNA evidence conclusively excludes [appellant] to submit a favorable finding, if the DNA evidence conclusively establishes that it was [appellant], to make a nonfavorable finding, or if the evidence is inconclusive to make a nonfavorable finding.

finding under article 64.04 when other evidence, including a victim's testimony, substantially links the appellant to the offense. *See Sanchez v. State*, No. 05-05-00400-CR, 2006 WL 620254, at *3 (Tex. App.—Dallas Mar. 14, 2006, pet. ref'd) (not designated for publication).

After carefully reviewing the record from appellant's trial and postconviction proceedings and after considering the probable impact that the DNA test results would have when combined with the incriminating evidence presented at appellant's trial and described above, we cannot conclude that it is "reasonably probable that [appellant] would not have been convicted" had the results been available in 1992. *See* Tex. Code Crim. Proc. Ann. art. 64.04; *see also Whitfield v. State*, No. 01-12-00081-CR, 2014 WL 3606447, at *2–3 (Tex. App.—Houston [1st Dist.] July 22, 2014, no pet.) (mem. op., not designated for publication) (holding that a trial court did not err by issuing a finding that was unfavorable to an appellant when tests of some biological materials matched the victim's DNA and tests of other biological materials were inconclusive). Therefore, we hold that the trial court did not err by finding that the test results were not favorable to appellant, and we overrule his only point.

**Conclusion**

Having overruled appellant's sole point, we affirm the trial court's October 22, 2013 "Order on Findings on Petitioner's DNA Motion."

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 12, 2015