

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00149-CR

OLLIE KING JR.                                         APPELLANT

V.

THE STATE OF TEXAS                                   STATE

----------

## FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant Ollie King Jr. appeals his conviction following a jury trial for aggravated assault with a deadly weapon.[2] He contends in one point that the evidence is insufficient to support his conviction because the State failed to disprove beyond a reasonable doubt that he acted in self defense. We affirm.

----

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. §§ 22.01(a)(1), .02(a)(2) (West 2011).

## II.  Background

Lionel Bell, fifty-two years of age at the time of trial, testified that he began renting a room from Appellant's sister, Linda King, in December 2007.  Appellant, Linda, and their sister had inherited the house from their parents and each owned one-third of the house.  The house had three bedrooms, and Bell paid Linda $500 per month to live in one of the bedrooms.

Appellant and Dennis Johnson moved into the house in January 2010, and Bell testified that the "atmosphere had changed within the house."  He said that Appellant acted as if he was in charge of the house and everything that occurred in it, and Appellant asked Bell to pay him one-third of the rent each month.  Bell testified that he initially resisted, telling Appellant that he needed to speak with Linda about the rent payments since Linda had originally set Bell's rent.  Linda told Bell not to pay Appellant any money, but Bell testified that he later decided to "keep peace in the house" and began paying Appellant thirty-three dollars per week in rent.

In late-June 2010, Appellant kicked in the door to Bell's room while Bell was at work.  Bell confronted Appellant the next day, telling Appellant that he was paying rent to live in that room and that Appellant had no right to enter the room.  Bell testified that he and Appellant began arguing, and he described the confrontation as "verbal, bordering on physical."  Bell admitted that he pointed an unloaded handgun at Appellant during the altercation.  Bell also admitted saying,

2

"You go ahead and kick my door in and see what happens." Bell testified that the confrontation ended at that point and that Appellant called the police.

When the police arrived, Bell lied to them and told them that he did not have a gun. Bell also told the police that he intended to move out within two or three weeks. Bell testified that he and Appellant "resolved the situation" after the police left; Appellant thanked Bell for not shooting him, and Bell told Appellant that the gun was not loaded. Bell testified that they shook hands and that they each expressed hope that a similar thing would not happen again. On cross-examination, Bell denied having a grudge against Appellant but acknowledged becoming angry at him for telling Linda that Bell smoked crack, an allegation that Bell denied.

On July 10, 2010, Bell was cleaning out his room to move out when Appellant asked him for thirty-three dollars in rent. Bell told Appellant that he might need the money for a down-payment on another place, and they started arguing. Bell testified that Appellant "got up in [his] face" and that he pushed Appellant away. The men then had a shoving match that moved into the living room and then onto the back patio.[3] After Bell knocked Appellant to the ground outside, Johnson intervened on Appellant's behalf. Appellant's tools were on the back patio, and Bell testified that Appellant grabbed a hacksaw and began "sawing" at Bell's legs for "[a]t least 30 seconds," causing cuts and bleeding.

---

[3]Bell testified that his gun was in his bureau drawer, not on his person, during this altercation.

3

Bell testified that Johnson separated him from Appellant and that Johnson went inside the house with Appellant. Bell testified that he had "had enough of this" and went into his room and counted out thirty-three dollars to give Appellant. When Bell entered the kitchen, Appellant was "standing in the area between the garage and the kitchen with a sledge hammer." Bell told Appellant to put down the sledge hammer, and Bell gave Johnson the money to give to Appellant. Appellant and Johnson then left the house.

Appellant and Johnson returned to the house approximately ninety minutes later. Bell testified that he walked into the living room and was attempting to explain to Appellant that he had his money and that he did not want any more contact with him when Appellant "went into the cushion of the sofa and pulled out the knife." Bell testified that Appellant advanced toward him, backed him into the fireplace, and "swung around in front of [him] and started stabbing."[4] Appellant stabbed Bell in the lower abdomen. Bell was able to push Appellant to the ground, but Appellant landed on top of Bell. Bell testified that Appellant continued stabbing him in the stomach and called for Johnson to get a second knife. When Appellant had a second knife, he cut Bell on the side of his head, separating his ear in several places. Bell testified that Appellant and Johnson then ran out the door, and Bell crawled toward his room and called 9-1-1. Bell underwent emergency surgery and was hospitalized for eight days.

_____

[4]Bell testified that he was wearing a shirt and boxer shorts at the time and that he did not have any weapons.

4

Appellant, fifty-eight years of age at the time of trial, also testified. He admitted kicking in Bell's bedroom door but testified that he did so because Linda had called him a "crackhead," and he wanted to show his sister that Bell had smoked crack the night before. Appellant testified that he attempted to apologize to Bell the next day but that Bell pulled a gun from his pocket and put it to his head. Appellant also testified that Bell's actions caused him fear of serious bodily injury or death. When the police arrived, Bell told them that Appellant was at fault, and the police did not search for the gun.

Appellant testified that his second confrontation with Bell occurred about three weeks later, on the day Bell was supposed to move out of the house. Appellant was preparing the house to sell it and needed help painting, so he intended to ask Bell for help in exchange for allowing Bell to live in the house for a few more days. But Appellant testified that when he knocked on Bell's door, Bell hit him and chased him out the back door of the house.[5] They continued fighting, and Appellant testified that he grabbed a miter saw and was trying to hit Bell with it until Johnson pulled Bell away. Appellant later testified that he intended to hurt Bell with the saw and that he was not going to stop sawing at his legs because Bell was not going to stop hitting him in the head.

_____

[5]Appellant testified that he did not say anything to Bell to provoke him. He also testified that, in the time between the first and second confrontations, he and Bell had gotten along "excellent[ly]."

5

When the men went back inside the house, Appellant told Johnson not to let Bell go into his bedroom because Bell kept his gun in there. Johnson followed Bell into the bedroom, and Appellant retrieved an axe from the patio. Bell returned to the kitchen-area with Johnson and tried to give Appellant rent money, but Appellant told him that he did not want the money because the house was for sale. Appellant testified that he and Johnson then left the house.

Appellant testified that when he returned to the house after the first fight with Bell, he retrieved a knife from his bedroom and hid it in the living room couch cushion for his protection in case "Bell was going to try and do what he said he would do." Appellant testified that he did so to be ready if Bell came at him again.

Appellant testified that, after he hid the knife, he sat on the couch and talked loudly with Johnson so that Bell would know they had returned. Bell entered the room after hearing Appellant's voice, and Appellant testified that Bell entered the room "like a mad man" and a "raging bull."[6] Appellant testified that he tried to diffuse the situation, asking Bell to sit down. Bell did not sit down and moved closer to Appellant, and Appellant testified that Bell attacked him, hitting him on both sides of his head.

Describing what happened next, Appellant testified,

---

[6]Appellant acknowledged, however, that he did not see any weapons on Bell at the time.

6

He is [hitting me]. And I am trying to get this knife up out of this couch. And just as soon as I can get a good grip on it, it's coming up. And I finally got one on it, and when I come up, I stuck it. I sure did. And then I stuck him again. And [Bell] evidently thought that I was hitting him with my fists in his gut because he is left and right on my head. Left and right on my head. I said, "This dude don't know I'm sticking him." I turned the knife up, and I show it to him. But I can't tell you what he said. But I don't run. Another right to my head and another left to my head and, pow, right here. Another right to my head. Bam. And another left to my head. Bam. And, pow, I hit him again.

That's how he got those licks behind his head. Not from no double knife on no floor. He's trying to get somebody else locked up, the man that saved him.

And he kept on. Another right. Bam. And another left. And he swinged, and he caught my wrist. And when he caught my wrist, I wasn't going to let him get the knife. I was a Marine. I tossed the knife away, out of my reach and out of his reach. Then I did hit him for the first time ever. I hit him for the first time ever. And I hit him, too. Bam. And then I went under there, and I got his leg. And I put my weight on my shoulder in his chest, and I took him down. Bam.

Appellant testified that he sat on Bell's stomach after Bell fell to the floor and that he hit Bell in the head with his fists. Appellant further testified, "I was scared for my life." He testified that Bell had a gun but that he did not know if Bell had it at that moment.

During cross-examination, Appellant testified that he was not scared that Bell would pull a gun on him in the three weeks between their altercations. He also testified that he was not backing down from a fight with Bell, stating, "When he's ready to kill me, come on and kill me because the killing -- we can get the killing on." Appellant later explained, however, that he made that statement to

Bell in an attempt to get Bell to sit down and discuss their disagreement and that he had no intent to have a "fight to the death" with Bell.

Appellant testified that he went to his cousin's house after the fight and later decided to turn himself in because he thought "everything w[ould] be all right" after he provided the police with the weapon and took a polygraph test.

### III.  Sufficiency of the Evidence

Appellant contends in his sole point that the evidence is insufficient to support his conviction because the State failed to disprove self-defense beyond a reasonable doubt.

### A.  Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075

(2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

## B. Discussion

A person commits aggravated assault with a deadly weapon if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon—here, a knife—during the commission of the assault. *See* Tex. Penal Code Ann. §§ 22.01(a)(1), .02(a)(2); *see also id.* § 1.07(a)(17)(B) (West Supp. 2012) (defining "deadly weapon" as anything that in the manner of its use or intended use is capable of causing death or serious bodily injury). However, penal code section 9.31(a)(1) provides in relevant part that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor

9

against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2011). Section 9.32(a) provides that a "person is justified in using deadly force against another" if using force is justified under section 9.31 and the "actor reasonably believes the deadly force is immediately necessary" to protect himself "against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(1), (2)(A) (West 2011).

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the State bears the burden of persuasion to disprove it. *Id.*; *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd). This burden does not require the State to produce evidence disproving the defense; it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913; *Dotson*, 146 S.W.3d at 291. To determine the sufficiency of the evidence involving a self-defense claim, the appellate court asks whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291.

Here, Appellant's testimony constitutes some evidence of self-defense. Appellant thus met his burden of production, but the State's evidence is also sufficient to carry its burden. Bell and Appellant each testified and offered very different versions of what occurred in late-June and on July 10, 2010, when Appellant stabbed Bell with the knife. It was for the jury to determine whether Bell's or Appellant's testimony was more credible, and we are not permitted to re-evaluate the weight and credibility of the evidence. *See Williams*, 235 S.W.3d at 750; *Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.). The jury could have reasonably believed that Appellant, not Bell, was the aggressor during the altercation on July 10 when Appellant stabbed Bell or that the use of deadly force was not justified under the circumstances. *See Williams*, 235 S.W.3d at 750; *Denman v. State*, 193 S.W.3d 129, 132–33 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (noting jury resolved credibility determinations and holding evidence sufficient to support aggravated assault with a deadly weapon conviction); *see also* Tex. Penal Code Ann. § 9.32(a) (defining justifiable use of deadly force in self-defense); *Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd) ("[A]ppellant's deadly force was not a justifiable response to [the victim]'s attempt to punch appellant, which was not deadly force."). For example, Bell testified that Appellant attacked him with the knife without provocation, and Appellant admitted that he did not know whether Bell had a weapon when he pulled the knife from the couch to stab Bell.

Viewing all the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of aggravated assault with a deadly weapon beyond a reasonable doubt and also could have found against Appellant on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291. We therefore overrule Appellant's sole point.

## IV. Conclusion

Having overruled Appellant's sole point, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 2, 2012