

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00374-CR

---

SCOTT ALLEN HARPER                                                      APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

----------

FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1374876D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Scott Allen Harper appeals his convictions for continuous sexual abuse of a child under fourteen and indecency with a child. In two points, Harper argues that the trial court abused its discretion by prohibiting him from presenting

---

[1]*See* Tex. R. App. P. 47.4.

evidence of the complainant's sexual orientation and by denying his motion for mistrial that alleged juror misconduct.  We will affirm.

## II. FACTUAL BACKGROUND

When the victim, Kelly,[2] was in third grade, her mother (Mother) moved out and left Kelly and her two younger brothers with their father, Harper.  Kelly and her paternal grandmother (Grandmother) raised her two younger brothers; Kelly's youngest brother, Cole, was one year old when Mother left.[3]  Kelly and her brother Chad slept in Harper's room during the summers because there was no central air in the house and because it was easier to keep one room cool with a window unit.  Kelly slept in Harper's bed, her brother Chad slept in a bed pushed up against the wall in Harper's bedroom, Harper slept on the couch in the living room, and Cole slept on a bed near the front door.

Kelly testified that sometime after third grade, on a night when she was sleeping in Harper's bed, he came in and thought she was asleep.  Kelly was wearing a tank top and underwear, and Harper started picking at her underwear from behind her, causing it to lift off her bottom.  Kelly testified that she was scared, that she did not understand what was going on or why Harper was doing this in the middle of the night while she was supposed to be asleep, that she laid

---

[2]To protect the anonymity of the child victim, we will use an alias for her, as well as for her brothers.  *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[3]Kelly testified that Harper never had a girlfriend after Mother moved out.

there and waited for Harper to stop, and that it did not last very long. Harper did not speak while he was picking at Kelly's underwear, and Kelly did not talk to him about it afterwards.

Kelly testified that she often watched shows on the computer with Harper and that she would sit on his lap. Sometime after the incident in Harper's bedroom, Harper began to touch Kelly while they watched shows on the computer in the living room. The first time occurred while they were watching a show on sharks when Kelly was about eleven or twelve years old; Harper put his hands on Kelly's stomach and moved his hand down into her underwear and touched her labia. Kelly testified that she was panicking but did not say anything. Harper moved his hand down, touched her lower labia, and left his hand there for a little bit. Kelly eventually stood up and went to her room.

Kelly testified that there were twenty to thirty other instances when Harper touched her while they were watching shows on the computer and that she was unable to distinguish between the events in her mind, except that there was at least one occasion when Harper inserted his finger into her vagina. Kelly said that Harper touched her at the computer from the time she was in fifth grade or sixth grade until the time she was in eighth grade, that it did not happen every time they watched shows on the computer, and that there was at least one instance that occurred thirty days apart from another instance of abuse. Kelly turned fourteen years old in December 2013 and testified that all of the instances of sexual abuse occurred prior to that birthday.

3

Kelly testified that Harper also touched her inappropriately once when they were "play wrestling" in the kitchen. Kelly said that Harper put her in a fake choke-hold and held her breast in his hand.

When Kelly got her own computer in seventh grade, she started seeing news stories on the internet about sexual abuse and realized that what Harper was doing to her was wrong. When Kelly realized that it was wrong, she started wanting to move out. Kelly did not move out immediately because she did not know what would happen to Cole. Several months before December 2013, Kelly told Mother that she wanted to live with her, and Kelly moved to Mother's house on December 27, 2013.

In January 2014, Kelly made an outcry to Mother and told Mother about what Harper had done.[4] Mother immediately called the police.

Stacy Henley, a sexual assault nurse examiner at Cook Children's Medical Center, testified that she examined Kelly on March 20, 2014. Kelly told Henley that Harper had touched her with his hands underneath her clothes and in her private area, that the touching had started when she was in the sixth grade and had occurred every two to three weeks, and that the last touching had occurred

---

[4]Kelly testified that the last incident of abuse occurred five or six months before her outcry.

4

five or six months prior to the exam. Kelly also told Henley that she had to touch Harper's penis[5] and that he had touched her breasts under her clothes.

Megan Peterson, an investigator with Child Protective Services, testified that Kelly underwent a forensic interview at Alliance for Children on February 24, 2014. Peterson testified that Kelly's forensic interview contained sensory details, peripheral details, and correct information, which indicated that Kelly was telling the truth. Peterson did not think that Kelly had been coached on what to say in her interview.

Grandmother testified that she quit her job and moved in with Harper when Mother moved out. Grandmother did not want Cole, who was approximately one year old at the time, to go to daycare, so she helped care for him until he was four years old and could attend pre-K. Grandmother testified that Chad was "a living room plant" who mostly stayed inside and that Cole also mostly played inside the home.

Harper testified that Mother left their marriage because she had decided that she wanted to be with women and because she and Harper hated each other and did not get along. Harper testified that he had dated a few times after Mother left but that he had not discussed that with his children.

---

[5]Although Kelly had previously said during a videotaped interview that she had felt Harper's penis when she sat in his lap, she testified at trial that she had no recollection of that occurring and watching her videotaped interview did not refresh her memory as to that event.

Harper testified that it would have been a rare situation for him to have been alone with Kelly because he "was never really alone with any of the kids individually." Harper admitted that there were occasions when Chad and Cole went outside to play baseball but said that there were always incidents when one of the boys would run back in to tell Harper what the other boy had done. Harper testified that he had never touched Kelly in any way or in any manner with the intent to arouse or gratify his sexual desire and that he had never put his finger inside Kelly's vagina. Harper testified that Kelly had lied when she said that he had come in one night and had picked at her panties. Harper testified that Kelly was not lying when she testified that he had her sit in his lap at the computer and that it was possible that he started feeling her stomach while he hugged her. Harper testified that Kelly was lying when she said that his hand had gone from her stomach to inside her panties and that she was lying when she said that Harper had touched her breast while they were wrestling.

After hearing the above evidence, the jury found Harper guilty of continuous sexual abuse of a child under fourteen and of indecency with a child and assessed his punishment at confinement for twenty-five years and two years, respectively. The trial court sentenced Harper accordingly and ordered the two sentences to run concurrently. Harper perfected this appeal.

### III. EXCLUSION OF SEXUAL-ORIENTATION EVIDENCE

In his first point, Harper argues that the trial court abused its discretion by prohibiting him from presenting evidence of Kelly's sexual orientation as evidence of her bias against him and her motive to falsely accuse him of sexually abusing her. Harper argues that the excluded evidence was admissible under Texas Rules of Evidence 412, 613, and 403 and that the exclusion of this evidence violated his constitutional right to cross-examine Kelly and to present a complete defense.

### A. Standard of Review

We review the trial court's decision to exclude evidence under an abuse-of-discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not abuse its discretion as long as the decision to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

### B. Rule 412

Harper asserts that evidence of Kelly's sexual orientation was admissible under rule 412 of the rules of evidence. Texas Rule of Evidence 412 is titled, "Evidence of Previous Sexual Conduct in Criminal Cases" and provides, in pertinent part:

> (a) In General. The following evidence is not admissible in a prosecution for sexual assault, aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault:

(1) reputation or opinion evidence of a victim's past sexual behavior; or

(2) specific instances of a victim's past sexual behavior.

(b) Exceptions for Specific Instances. Evidence of specific instances of a victim's past sexual behavior is admissible if . . . .

Tex. R. Evid. 412. Thus, under rule 412, in a sexual assault case, the following evidence is not admissible: (1) reputation or opinion evidence of the victim's past sexual behavior or (2) specific instances of a victim's past sexual behavior. Tex. R. Evid. 412(a)(1), (2). But exceptions exist to rule 412's prohibition concerning the admission of specific instances of a victim's past sexual behavior. Tex. R. Evid. 412(b)(2)(C), (3).

## C. The Excluded Evidence

During his opening statement, Harper's counsel stated that during the time leading up to when Kelly moved in with Mother, Kelly "want[ed] to come out [as a lesbian] and be like her mom." The State objected, and the trial court sustained the objection under rule 412.

After Kelly testified and prior to cross-examining her, Harper's counsel requested a rule 412 hearing. Harper's counsel argued that he should be permitted to question Kelly about her sexual orientation and to present testimony that Kelly had told a girlfriend of Kelly's mother that Kelly wanted to live with Mother because Harper and Grandmother are "very anti-homosexual." Harper's counsel argued that testimony about Kelly's sexual orientation was admissible under one of the specific-instances exceptions to rule 412 to show Kelly's motive and bias in making sexual assault allegations against Harper. Harper's counsel

8

argued that the jury had been left with the impression that Kelly did not want to live with Harper because of the alleged sexual abuse and that testimony regarding Kelly's sexual orientation would show that the reason she moved to Mother's house was due to Kelly's "coming out [as] a lesbian." The trial court ruled that defense counsel could not question Kelly about her sexual orientation.

After cross-examining Kelly, Harper's counsel requested that he be allowed to ask Kelly whether there was another reason why she had wanted to live with Mother, besides the allegations against Harper. The trial court allowed defense counsel to ask Kelly this limited question. The following cross-examination of Kelly then took place:

> Q. . . . Beyond the reasons and the things you've testified at this point, have you ever told anyone of any other reason why you didn't want to live with your father?
>
> A. Just we didn't get along anymore and I didn't want to live there.
>
> Q. I'm sorry. Can you speak up a little bit?
>
> A. We didn't get along anymore and I didn't want to live there.
>
> Q. Were there any particular reasons about that that you may have told someone?
>
> A. Why we didn't get along anymore?
>
> Q. Yeah, I guess.
>
> A. I -- I was in my room too much. I wasn't hanging with the family anymore. That's it. We just didn't get along because of that.

After the State rested, Harper's counsel called Grandmother to testify outside the presence of the jury. Grandmother testified that Kelly is a lesbian

9

and that Kelly had made statements about her sexual orientation on Facebook and had attended several gay parades. Grandmother testified that Kelly knew that Grandmother disapproved of homosexuality. Grandmother testified that she had no knowledge about whether Kelly had gone to live with Mother because of Kelly's lesbianism; accordingly, Harper's counsel stated that he would not pursue this line of questioning with Grandmother in front of the jury. Defense counsel also chose not to call the woman who had allegedly heard this explanation from Kelly.

### D. Analysis Under Rule 412

Harper asserts that Kelly's sexual orientation is not evidence of any specific instance of sexual behavior under rule 412(a)(2) and therefore should not have been excluded under rule 412. During trial, Harper's counsel did not elicit testimony—either in front of the jury or outside the jury's presence—detailing any specific instances of Kelly's past sexual behavior. Consequently, in the absence of evidence of a specific instance of sexual behavior, the exceptions to rule 412(a)(2)'s automatic exclusion of specific instances of a victim's past sexual behavior are not triggered. *See* Tex. R. Evid. 412 (b)(1)–(3) (permitting admission of specific instances of a victim's past sexual behavior under certain circumstances). That is, because no evidence of a specific instance of Kelly's

past sexual behavior was proffered, as a matter of law rule 412(b)'s exceptions to exclusion of such evidence do not apply.[6]

And rule 412(a)(1) provides that reputation or opinion evidence of a victim's past sexual behavior is not admissible in a prosecution for sexual assault. *See* Tex. R. Evid. 412(a)(1). Grandmother's testimony about Kelly's sexual orientation, which was excluded, constitutes reputation or opinion evidence about a victim's past sexual behavior that is not admissible. *See* Tex. R. Evid. 412(a)(1); *Rankin v. State*, 821 S.W.2d 230, 233 (Tex. App.—Houston [14th Dist.] 1991, no pet.) (holding witness's testimony about victim's sexual behavior based on victim's reputation was inadmissible under rule 412(a)); *see also Rouchon v. State*, No. 04-99-00951-CR, 2001 WL 1265550, at *2 (Tex. App.—San Antonio Oct. 24, 2001, pet. ref'd) (not designated for publication) (holding that witness's testimony as to victim's bisexuality constituted reputation or opinion evidence). No exceptions exist to rule 412(a)(1)'s automatic exclusion of reputation or opinion evidence of a victim's past sexual behavior. *See* Tex. R. Evid. 412(b); *Allen v. State*, 700 S.W.2d 924, 940 n.9 (Tex. Crim. App. 1985) (Clinton, J., dissenting) (stating that rule 412 excludes "reputation or opinion evidence of the past sexual behavior of an alleged victim of such [prescribed] crime," but allows "evidence of specific instances of an alleged victim's past sexual behavior" if admitted in accordance with control provisions). Accordingly,

---

[6]Accordingly, we reject Harper's alternative arguments that assume the excluded evidence constitutes specific-instance evidence.

11

we hold that the trial court properly excluded evidence of Kelly's sexual orientation under rule 412(a)(1).[7]  *See* Tex. R. Evid. 412(a)(1); *Rankin*, 821 S.W.2d at 233; *see also Rouchon*, 2001 WL 1265550, at *2 (same).

### E. Rule 613, Rule 403, and Confrontation Clause Arguments Forfeited

Harper argues that evidence of Kelly's sexual orientation—through Grandmother's excluded testimony and through the prohibited questioning of Kelly about it—should have been permitted under Texas Rules of Evidence 613 and 403 and that exclusion of the evidence violated his constitutional right to cross-examine witnesses against him and to present a complete defense.  At trial, Harper argued that evidence of Kelly's sexual orientation should not be excluded under rule 412; he did not address rule 613, rule 403, or the Confrontation Clause.

---

[7]Although not briefed by the parties, evidence of Kelly's sexual orientation was also properly excluded on relevancy grounds.  Throughout the rule 412 hearings held outside the jury's presence, the trial court questioned the relevance of such evidence and stated "you haven't been able to establish the relevance for me."  *See* Tex. R. Evid. 401, 402.  Moreover, during cross-examination, Kelly did not list her sexual orientation as a reason for wanting to move in with Mother; Grandmother testified that she did not hear Kelly make that statement; and the defense did not bring in the witness who had allegedly heard Kelly make that statement.  Thus, the trial court also did not abuse its discretion by excluding evidence of Kelly's sexual orientation on relevancy grounds.  *See* Tex. R. Evid. 401, 402; *In re O.O.A.*, 358 S.W.3d 352, 355, 357–58 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding evidence of victim's sexual orientation inadmissible as irrelevant because appellant did not show connection between victim's sexual orientation and motive for her testimony against appellant); *see also Smith v. State*, 352 S.W.3d 55, 64, 68 (Tex. App.—Fort Worth 2011, no pet.) (recognizing proponent of evidence of alleged bias must show relevancy).

12

To avoid forfeiting a complaint on appeal, the party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). Making an objection or proffer under the rules of evidence does not preserve constitutional issues that are not raised. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005).

Because Harper requested the trial court to rule on the admissibility of the testimony solely under rule 412, we hold that Harper's argument at trial did not preserve for appeal his rule 613 argument, his rule 403 argument, or his Confrontation Clause argument. *See* Tex. R. App. P. 33.1(a)(1)(A); *Reyna*, 168 S.W.3d at 179 (holding Confrontation Clause issue was not preserved for appeal because appellant's trial arguments regarding witness's credibility reflected argument that evidence was not excludable under rule 412(b)); *Lubojasky v. State*, No. 03-10-00780-CR, 2012 WL 5192919, at *5 (Tex. App.—Austin Oct. 19, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that appellant did not preserve for appellate review his complaints regarding exclusion of evidence under rule 613(b) and Confrontation Clause).

Accordingly, we overrule Harper's first point.

## IV. DENIAL OF MOTION FOR MISTRIAL

In his second point, Harper argues that the trial court abused its discretion by denying his motion for mistrial alleging juror misconduct occurred when certain jurors engaged in a pre-deliberation hallway conversation that Harper contends showed their bias against him.

### A. Standard of Review and Law on Motions for Mistrial

We review the denial of a motion for mistrial under an abuse of discretion standard. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Determinations of historical fact and assessment of witness credibility and believability are left almost entirely to the discretion of the trial judge, and where there is conflicting evidence, there is no abuse of discretion if the motion for mistrial is overruled. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App.), *cert. denied*, 531 U.S. 980 (2000). The trial court's ruling must be upheld if it is within the zone of reasonable disagreement. *Ocon*, 284 S.W.3d at 884.

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Id.* Because it is an extreme remedy, a mistrial should be granted "only when residual prejudice remains" after less drastic alternatives are explored. *Id.* at 884–85. Less drastic alternatives include questioning the jury "about the extent of any prejudice," if instructions alone do not sufficiently cure the problem. *Id.* at 885 (quoting *Arizona v. Washington*, 434 U.S. 497, 520–22, 98 S. Ct. 824, 838–39 (1978) (White, J., dissenting)). Though requesting lesser remedies is not a prerequisite

14

to a motion for mistrial, when the movant does not first request a lesser remedy, we will not reverse the trial court's judgment if the problem could have been cured by the less drastic alternative. *Id.* (citing *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004)).

### B. Law on Juror Bias

"A juror must . . . use the law, the evidence, and the trial court's mandates as his ultimate guides in arriving at decisions as to guilt or innocence and as to punishment." *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 927 (2003). When a juror "makes statements outside of deliberations that indicate bias or partiality, such bias can constitute jury misconduct that prohibits the accused from receiving a fair and impartial trial." *Id.* Although "it defies common sense and human nature to require that a juror have no impressions or opinions until the judge send[s] the jury to deliberations," where a juror's statements or conduct raise a question as to whether he is biased, "an inquiry is appropriate to determine the juror's intent when making the statement." *Id.* at 236. On such an inquiry, the trial court retains discretion in determining whether a juror is biased, and we will review the trial court's decision in the light most favorable to its recorded findings. *Id.*

### C. Evidence of Alleged Juror Misconduct

On the second day of the trial, out of the jury's presence, Harper's counsel reported to the trial court that Harper's aunt and uncle had overheard three jurors discussing the case in a manner that indicated the jurors had concluded that

Harper was guilty before hearing all of the evidence. The trial court conducted a hearing on the alleged juror misconduct and heard testimony from Harper's aunt and uncle.

Harper's uncle testified that when he returned from lunch the previous day of the trial, he heard three jurors (a Caucasian man, a man who was Caucasian or Hispanic, and an African-American woman) discussing the case in the hallway of the courthouse where approximately eight other jurors were seated. One man stated that he did not believe Harper's counsel's statement during voir dire about Harper being a free man because if he were free, he would not be in court. The other two jurors acknowledged the statement. When the jurors recognized Harper's uncle and aunt as Harper's relatives, they said that they had better be quiet. Harper's uncle testified that he did not hear the word "guilt" being used and did not believe that the jurors were making an assertion of Harper's guilt or innocence. Harper's uncle further testified that he believed that other jurors in the hallway could have possibly overheard the conversation.

Harper's aunt testified that she had overheard the conversation in the hallway and that it "had something to do with some of the jurors saying that [Harper's] not free or he wouldn't be here" but that they did not say anything about guilt or innocence. Harper's aunt said that she was reading a book, that she was not paying attention to the hallway conversation, and that she could not testify with any accuracy to the comments that were made. Harper's aunt did not believe that the statement had any bearing on the case.

16

After hearing testimony from Harper's aunt and uncle, the trial court questioned each of the jurors individually in response to defense counsel's request. Juror No. 14 testified that he had told a group of jurors that he knew the trial judge did not like it when he (the juror) had asked a question during voir dire about whether Harper was free.[8] Each of the remaining jurors denied or did not recall participating in or overhearing a conversation about Harper's freedom after lunch the prior day. At the end of each interview, the trial court instructed the juror not to discuss any of the matters that were asked about and reminded the juror to follow the other instructions that the trial court had given. The trial court then made its ruling as follows:

> The Court hereby denies the Defense motion for a mistrial on the following grounds: After interviewing the respective jurors, the jurors that are in question have denied or stated that the conversation that was believed to have a comment concerning the Defendant and his freedom also is associated and could be mistaken with regard to his ability to move during the voir dire selection.
>
> In fact, one of the jurors had to be reminded of the -- of the incident because he was confused, and he confirmed that there

---

[8]During voir dire, defense counsel asked the venire panel about whether they had changed their minds about being able to consider all of the evidence before deciding whether Harper was guilty or not. In response, an unidentified prospective juror asked, "In your opening statement, you said we all came in here free people, we're all going to leave as free people. Can Mr. Harper leave today free?" The trial court interjected that it was not going to allow defense counsel to respond to the question. The trial court further stated, "Just understand there's a presumption of innocence in every case. Everybody's presumed innocent until and if the State ever proves their case beyond a reasonable doubt. With regard to whether he's free to go or not go, that's -- that's not material . . . for the purpose of the voir dire."

17

were no other conversations regarding the Defendant's ability to move about.

And, furthermore, during the voir dire process, a -- an additional peremptory strike was agreed to by the State and granted by the Court with regard to the potential juror that would have been seated and was excluded on that basis in an abundance of caution, and furthermore, the Court did believe that that juror did make some comment to that effect.[9]

The Court concludes that Mr. Harper, the uncle, is -- also has a concern about his nephew and potentially may have some motive not necessarily to lie but to be hypervigilant or less than accurate. His wife did not hear such a conversation, and fragments of it were not clear for her to be of any credibility as well.

Accordingly, the Court, after considering the information that was presented by the Defense, the respective witnesses that testified, interviewing the respective juror -- the respective jurors that are assigned to this case, the Court hereby concludes that the Defense motion should be and is hereby denied.

### D. Analysis

Here, conflicting testimony exists on the content of the jurors' conversation.

Harper's uncle testified that three jurors had a conversation about Harper not

being a free man because he was in court, and Harper's aunt testified that

---

[9]During a break in voir dire, it was brought to the trial court's attention that two members of the venire panel had been talking, and one stated, "I don't think anyone thinks he's still innocent; if it were me, I'd offer him 15 years and be done with it." The venire member who had overheard the conversation identified the two venire members who were involved in the conversation and said that the remaining members of the panel were approximately eight feet away or across the hall when the conversation occurred. Because the venire member who had made the statement was slated to be seated on the jury, the trial court granted the defense an additional peremptory strike. Neither the venire member who overheard the conversation, nor the venire member who was involved in the conversation were seated on the jury.

although she was also present in the hallway at the time of the conversation, she was not paying attention to it and could not testify with any accuracy as to the comments that were made. Eleven of the twelve jurors testified that no such conversation had occurred the previous day or that they could not recall a conversation from the previous day about Harper being a free man; the remaining juror testified only that he had made a comment that the trial judge did not like when he (the juror) had asked during voir dire whether Harper was free to leave. Moreover, both Harper's uncle and aunt testified that the conversation they overheard did not include a premature assertion that Harper was guilty. Deferring to the trial court's assessment of the witnesses' credibility and believability, it was within the trial court's sound discretion to determine that none of the jurors had made a statement indicating bias or partiality. *See id.* (holding that trial court's inquiry was sufficient to determine that juror was not biased against appellant). Moreover, the trial court reminded the jurors to follow his instructions,[10] and there is no indication that any of the jurors disobeyed those instructions or otherwise attempted to improperly influence the jury's deliberations. *See id.* Accordingly, we hold that the trial court did not abuse its discretion by denying Harper's motion for mistrial. *See id.* (holding that trial court did not abuse its discretion by denying appellant's motion for mistrial based on

---

[10]The instructions previously given to the jury included the following: "[D]o not even discuss the case among yourselves until after you have heard all of the evidence, the Court's Charge, the attorneys' arguments[,] and until I have sent you to the jury room to consider your verdict."

alleged juror bias); *Barrow v. State*, No. 14-14-00680-CR, 2016 WL 280196, at *5 (Tex. App.—Houston [14th Dist.] Jan. 21, 2016, pet. filed) (mem. op., not designated for publication) (same). We overrule Harper's second point.

## V. Conclusion

Having overruled Harper's two points, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 28, 2016