

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-18-00148-CR

MARY CATHERINE WALTERS                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
## TRIAL COURT NO. CR13070

----------

## MEMORANDUM OPINION[1]

----------

A jury rejected her self-defense claim and convicted Appellant Mary Catherine Walters of aggravated assault with a deadly weapon. The jury assessed her punishment at four years' confinement in the Institutional Division of the Texas Department of Criminal Justice (TDCJID), and the trial court sentenced her accordingly. Appellant brings a single issue on appeal,

---

[1]See Tex. R. App. P. 47.4.

challenging the sufficiency of the evidence to support the jury's rejecting her self-defense claim. Because, on the record before this court, a rational trier of fact could have found the essential elements of aggravated assault beyond a reasonable doubt and rejected Appellant's claim of self-defense, we affirm the trial court's judgment.

## Brief Facts

Appellant was the mother-in-law of Complainant Cody Sudderth, who at the time of the offense was married to Appellant's daughter, Stephanie. Appellant lived in Mineral Wells with her husband and ran a bail bond business. Stephanie and Complainant lived in Granbury with their three children. Stephanie would call her mother to complain when she and Complainant were fighting and ask her to pick up the children or the children and her. Complainant testified that there was "no stress with Stephanie at all," but he was planning to leave her and take the children with him to Houston. He told the jury he was having no problems with Stephanie; their love had just failed.

But Complainant also appeared to testify that he and Stephanie had fought the day of the offense. Although at first he testified that he and Stephanie had not been quarrelling or fighting that day because they had just lost a daughter, in response to the question, "What were you talking about, then?" he replied, "Just we were fighting." Then the following confusing exchange took place:

Q: Sir?

A: We were fighting.

2

. . . .

Q:  Are you telling this Court and telling this jury that you and Stephanie got along fine?

A:  Yes, sir.

Complainant denied knowing who Christie Meeks, Stephanie's cousin who cleaned their house regularly, was.  He remembered an Easter celebration at their house with his wife, in-laws, and children.  He denied getting angry that day. He denied threatening to kill Appellant.  He denied that Appellant was in the habit of taking the children to give Stephanie and them a place to stay while Complainant and Stephanie were fighting.  He testified he had never done Stephanie or her family wrong.  When asked why Appellant would attack him if he had never done any of them wrong, he responded,

A:  Either for my dad's money, or me, I was saying that I wanted to take the kids.

Q:  What do you mean, you wanted to take the kids?

A:  It wasn't working between me and [Stephanie], because our — our love failed . . . .

. . . .

A:  There was no problems.

. . . .

Q:  Where were you going to take the kids, then?

A:  Back home.

Q:  Where was back home?

3

A: Alvin, Texas.

Q: Is that what you wanted to do?

A: Yes, sir.

Q: Was Stephanie happy about that?

A: No.

. . . .

Q: Had you told her that's what you were going to do?

A: No, sir.

Q: Were you doing it, then, without her knowledge?

A: No, sir.

He admitted he had not told Stephanie he was leaving and taking the children, but he denied he had a plan to leave: "It wasn't planned. It was in my mind."

Complainant testified that on the night of the offense he was on the bed, sleeping on his stomach in a T-shirt and some night pants when he was "woken up to a bat to the head, and all [he] heard was the ping, and [he] stood up." He started to fight Appellant off of him. She was still swinging the bat, but he finally managed to take the bat from her and push her out the bedroom door and lock it. He grabbed his deer rifle, a .300 Weatherby, out of his closet and chambered a shell, and when he opened the bedroom door, Appellant "came out of the laundry closet and started slicing and dicing." Complainant claimed they fought for the

4

rifle, and Appellant was trying to take it from him, so he fired it "[d]ownward, on that side of the bed, the bottom half." He said he fired it so Appellant could not pick up the rifle and shoot him.

Complainant testified that as soon as he fired the rifle, he ran outside to his neighbor Calvin Sims's house and banged on his door because he was bleeding a lot and afraid Appellant might "finish [him] off." Sims brought Complainant into his house and called 911.

Complainant did not know whether he was treated and released at the hospital or checked in. He did remember he had his baseball bats and bag outside in the back of his truck, even though it was raining.

Sims testified that he awakened around midnight because Complainant was pounding on his door, screaming, "Let me in." He also testified Complainant said, "Let me in, she's going to kill me if I can't hide . . . ." The recording of the 911 call reveals Sims's concern about the amount of blood on Complainant and the rate of Complainant's blood loss. Photographs show cuts on both of Complainant's hands.

Christie Meeks Santiago testified she is Stephanie's cousin by marriage and did not get to know Complainant particularly well because she had issues with him. But she did clean their house on occasion to help Stephanie and the children out. She also made a practice of going to Stephanie's house with Appellant because she did not feel it was safe for Appellant to go alone because of Complainant. On Saturday of Easter weekend she went to Stephanie's and

5

Complainant's house to clean it at Stephanie's request. Appellant took the children out of the house. Stephanie helped very little and Complainant, not at all.

Christie testified that on Easter Sunday, Complainant was angry and was taking his anger out on Appellant: "He had told her that he would kill her, and said that he would kill Stephanie as well." His conduct "ruined" the Easter plans, so Christie and Appellant left. Stephanie refused to leave. In the two to three years before the offense, Christie had gone with Appellant to pick up either the children or Stephanie and the children about twice a week, and the children might stay with Appellant the entire weekend or the entire summer.

On the night of the offense, however, Christie had other plans, and instead of going with Appellant to pick up the children when Stephanie called, she went to Fort Worth with her date. Appellant asked a bail-bond client to go with her instead. Christie saw Appellant the next morning. Appellant had powder burns on her face.

Appellant testified on her own behalf. Her view of the events of the night of the offense and of the surrounding circumstances was quite different from that of Complainant, and her testimony both supported and contradicted other witnesses' testimony. Appellant testified that she was 52 years old, was married to her second husband, and had only one child, Stephanie, with her first husband. She had worked as a bail bondsman since she was 23. The family had moved from Houston and lived together in Appellant's house for a year and a

half. One grandchild had died, and she described her relationship with her remaining grandchildren as more than close. When Complainant and Stephanie had at one point lost custody of the children, the children lived with Appellant for two months until the parents could pass drug tests. According to Appellant, Stephanie and Complainant moved to Granbury because Complainant had "jerked [Appellant's granddaughter] up[ and] broke her arm."

Appellant testified she had to go to Granbury to pick up the children all the time because of domestic disputes. The children would stay with Appellant from two days to two weeks. On the Saturday before Easter, Appellant and her husband took the children and Complainant fishing at Lake Granbury while Christie and Stephanie were supposed to clean the house. There were no problems during the fishing trip. But Appellant testified that she and her husband went back to Granbury on Easter Sunday for an Easter egg hunt for the children. Appellant and Stephanie were talking in the kitchen when Complainant came into the kitchen from the bedroom and said Stephanie would die of an overdose within five months and he would kill Appellant. Appellant and her husband left without finishing the Easter egg hunt.

The following Thursday night, Stephanie called Appellant to come to Granbury to get the children. Appellant left her house to pick up her grandchildren. Her husband did not go. She took one of her bail-bond clients instead. Appellant testified that when she arrived at Stephanie's house, she tapped on the door and went inside. The children's backpacks were lined up in

7

the hall, and Appellant was standing in front of the bedroom door talking to Stephanie when Complainant came forward and knocked Stephanie out of the way. He was "coming over the top of [Stephanie] with — with a stick or bat or something." Appellant thought he was going to knock her in the head with the baseball bat so she reached up, grabbed the bat, and shoved him back with it. She "popped him with it and threw the bat down."

Appellant testified Complainant did a back flip onto the bed and that she was trying to get out of the house, but kept tripping over clothes on the floor because she had a bad leg. She fell and was trying to stand up but by then, Complainant had grabbed a knife, and Appellant and Complainant started fighting over the knife. He managed to jab at her about seven times before she grabbed his arm and threw all her weight into him. They fell down onto the floor, and suddenly Complainant had a gun. He was screaming that he would kill her and called her "cuss words."

Appellant testified she was using the foot of the bed to try to pull herself off the floor when he put his knee on her. He pushed the barrel of the gun at her face, hitting her face, when she shoved the barrel over just as the gun discharged next to her head. She managed to hit him with the butt of the gun and throw it down.

Appellant testified she threw the gun on the bed and told Stephanie to get the backpacks and come with her. Stephanie refused. Appellant said she was leaving anyway, and Stephanie responded, "Please don't call the cops and put

8

him in jail, Mama." Appellant said she told Stephanie, "Whatever, I'm not doing this anymore," and left. She also testified that she had no injuries or cuts when the police arrived at her house the next morning.

Sylvia Vila is the bail-bond customer and friend who went to Stephanie's house with Appellant. On the night of the offense, Sylvia went to Appellant's house to borrow money. Appellant was ill with a cold and in a panic because of an "incident that had happened with — the daughter and her husband or boyfriend or whatever." Appellant asked Sylvia to drive her in Appellant's car to Stephanie's house to pick up Stephanie and her children. Sylvia testified the goal was to act quickly to avoid any confrontation whatsoever. Appellant had nothing in her hands when she went into the house. Soon she ran out of the house "in a panic" and said, "Go, go, go." When they drove off, Sylvia realized Appellant had a big gun in her hands.

Sylvia testified Appellant appeared to be in shock and kept repeating that there had been gunshots. Sylvia told Appellant she had been to prison and could not be around guns, and that they would have to get rid of the gun. The next morning the police contacted Sylvia, and she lied to them and told them she had had the car all night. Sylvia also admitted that there had come a time when she began paying her bond fees to Appellant in methamphetamine and that she and Appellant would use methamphetamine together.

9

## Self-Defense Burden of Persuasion

In her sole issue, Appellant argues that the evidence is insufficient to support the jury's verdict because the evidence of self-defense precluded her conviction.[2] A defendant has the burden of producing some evidence to support a claim of self-defense.[3] The State has the burden of persuasion to disprove self-defense.[4] This burden does not require the State to produce evidence refuting the self-defense claim; rather, the burden requires the State to prove its case beyond a reasonable doubt.[5] Self-defense is an issue of fact to be determined by the jury.[6] A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.[7]

A person commits aggravated assault with a deadly weapon if she intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault.[8] The Penal Code also provides that "a person is justified in using force against another when

---

[2]*See* Tex. Penal Code Ann. §§ 9.31–.32 (West 2011).

[3]*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

[4]*Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991).

[5]*Id.*

[6]*Id.* at 913–14.

[7]*Id.* at 914.

[8]Tex. Penal Code Ann. § 22.02(a) (West 2011).

10

and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."[9]   Self defense is a "confession and avoidance" justification defense.[10]

In the case *sub judice*, Appellant was charged by indictment with aggravated assault of Complainant, a family member, by causing serious bodily injury to him by hitting him in the head with a baseball bat and by stabbing him in the ribs and cutting his hands with a knife.  Alternatively, she was charged with aggravated assault of Complainant by causing bodily injury to him, using deadly weapons, by hitting him with a baseball bat, and by stabbing him with a knife. The jury charge, however, instructed the jury to convict of aggravated assault with a deadly weapon if the jury found Appellant knowingly and intentionally caused bodily injury to Complainant by hitting him in the head with a baseball bat and by stabbing him in the ribs and cutting his hand and fingers with a knife, and if they further found the bat or knife was a deadly weapon.  The jury was also instructed to acquit if they found Appellant had acted in self-defense or if they had a reasonable doubt whether she had acted in self-defense.

---

[9]*Id.* § 9.31(a).

[10]*Gamino v. State*, 537 S.W.3d 507, 511 (Tex. Crim. App. 2017).

11

Appellate courts apply the *Jackson* standard in conducting a due-process review of the sufficiency of the evidence.[11] In that due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, including that Appellant did not act in self-defense.[12]

The trier of fact is the sole judge of the weight and credibility of the evidence.[13] Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.[14] Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict.[15] We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.[16]

---

[11]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

[12]*Id.*, 99 S. Ct. at 2789; *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

[13]*See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

[14]*See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

[15]*Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

[16]*Id.*

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in determining guilt.[17] To determine the legal sufficiency of the evidence to disprove self-defense, the appellate court asks whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt.[18]

Appellant traveled from her house in Mineral Wells to Complainant's house in Granbury. Although there is evidence that she could have believed she was needed to remove her grandchildren from their home, there is no evidence she observed any threat to the children after she arrived at their house. Appellant offered testimony that Complainant had shot at her, but there was also evidence that she took the gun out of the house with her. She testified Complainant swung the baseball bat at her, but by her own testimony, she took the bat away from him and hit him with it. His blood spatter, indicating multiple injuries, was found on the wall. Only Complainant's DNA was found on the bat. Appellant testified that she and Complainant struggled over the knife, but both her and

---

[17] *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

[18] *Smith v. State*, 352 S.W.3d 55, 62 (Tex. App.—Fort Worth 2011, no pet.) (citing *Saxton*, 804 S.W.2d at 914; *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd)).

Complainant's DNA was found on the knife's handle and Complainant, not Appellant, suffered from knife wounds. Complainant was treated at the hospital for his multiple injuries. Appellant appeared to have no injuries and did not suggest she was defending a third party.

## Holding

Considering the entire record as a whole, and applying the appropriate standard of review, we hold the evidence sufficiently supports the jury's rejection of Appellant's defense of self-defense. We overrule her sole issue on appeal and affirm the trial court's judgment.

/s/ Lee Ann Dauphinot

LEE ANN DAUPHINOT
JUSTICE

PANEL: GABRIEL and BIRDWELL, JJ.; and LEE ANN DAUPHINOT (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 21, 2018